PER CURIAM.
We affirm the appealed final judgment and order denying appellants’ motion for a new trial and/or remittitur rendered on the same day.
The decedent, Jose (a/k/a Joe) Gresham was injured in an Amtrak train derailment in South Carolina on July 31, 1991, and died from his injuries on August 28,1991. Appel-lees, the estate of Jose Gresham, six surviving adult children and one surviving stepchild of Mr. Gresham from two previous marriages, filed suit against appellants.[1] Liabili *1056 ty was not contested at trial, and the case proceeded on the issue of damages only. After a four day trial, the jury awarded the estate $42,500, and each surviving adult child, including the step child, $400,000 for “the loss of parental companionship, instruction and guidance, and in the child’s pain and suffering as a result of JOE GRESHAM’s injury and death[.]” The award to each child included $200,000 in past damages, and $200,-000 in future damages. The total amount of damages awarded was $2,842,500.
The trial took place in Broward County, Florida, where nine months earlier, in March, 1993, an Amtrak train collided with a gasoline truck at the railroad crossing at Cypress Creek Road (Cypress Creek accident). Six people were killed when flames engulfed vehicles waiting at the crossing. An Amtrak train collided with a car at a crossing in Fort Lauderdale less than a month prior to the trial in this case. Amtrak trains were also involved in highly publicized accidents in Alabama in September, 1993, in which forty-seven people were killed; and in Osceola County, Florida, where an Amtrak train derailed on November 30,1993, injuring sixty-one passengers.
During voir dire in the instant case, one of the potential jurors stated that she “watched the news on the accident that Amtrak has had[,]” and that she felt something was wrong with the company. Thereafter, counsel for appellants asked the potential jurors about the Cypress Creek accident, describing it as a “very graphic accident.” A second potential juror, Mr. Lattinelli, who ultimately sat on the jury in this ease, said he was at the train stop when it happened.
Joel Gresham was the first witness to testify at trial. Joel, the decedent’s oldest son, lives in Atlanta and works as a professional artist. He worked with his father for eighteen years in lawn maintenance, and whenever he visited from Atlanta. Joel described his relationship with his father when he was a child. He said during the final ten years of his father’s life the family was getting closer.
On the day after the accident, Joel and some other family members flew to South Carolina. Joel saw his father at the hospital, and described his father’s head as swollen three times its normal size. At this point in the trial, another family member was asked to leave the courtroom by one of appellees’ trial counsels due to an emotional outburst. The jury left the courtroom, and the family member was removed. Upon returning, the jury was instructed that because sympathy was not to be encouraged, the trial court would remove the jury from time to time to control emotional displays. Thereafter, Joel continued his testimony, stating that he stayed in South Carolina and visited his father daily until his death. Joel said that since his father’s death, he has had trouble concentrating on his artwork. Everyday he has memories of his father, and gets angry about his father’s death.
The decedent’s step-daughter, Gloria Lo-vell, testified next. Gloria is a thirty-nine year old intensive care unit (ICU) nurse who resided in Fort Lauderdale.[2] She said her early years with her father were wonderful, but she was informed when she was sixteen years old that the decedent was not her natural father. As a result, their relationship became “distant.” After a few years, they began to get closer, and she would see her father when the family got together at her sister’s home, and when he came by her house to visit. At the time of the accident, Gloria could not get time off of work because she had just started a new position, and she had just gone through a divorce. Gloria kept in contact with the family members in South Carolina by phone, and told them to talk with their father in order to stimulate him. She made plans to travel to South Carolina, but her father died before she could do so. Gloria broke down on the stand when she related getting the news of her father’s death, and the jury was removed from the courtroom. When the jury returned, it was instructed to disregard anything that may interject sympathy in this case.
Gloria said that in the final five to ten years of her father’s life, she and her father *1057 were developing a closer relationship. On cross examination, Gloria said her work was not affected by her father’s death. She testified that she saw her father about three or four times a year, and called her relationship with her father “a little distant.” Gloria acknowledged that she was not included in her father’s will while the other six children received equal shares.
Randy Gresham, a thirty-three year old deputy with the Broward County Sheriffs Department, testified that he lived with his father for three weeks after getting out of the army. He worked with his father in the lawn maintenance business both while growing up and after getting out of the army. Randy testified that his father would visit him and his family once or twice a week, and that he visited his father quite a lot.
Randy traveled to South Carolina with Joel, but only stayed through the weekend (four days). He said he could not stand to look at his father and the suffering he endured, and wanted to remember him as he was before the accident. He returned one time prior to his father’s death. Randy said his job performance dropped after his father’s death, but he has learned to suppress his feelings so that he could continue to work. Randy keeps a picture of his father in his patrol car, and has had dreams about him since his death. Randy says he continues to feel the loss, and at times he smells his father’s clothes because he draws closeness from that.
Renardo Gresham, a twenty-eight year old wholesale and commercial supply distributor who lived in Broward County, next testified about his loss in this case. He said that while he was growing up he would work with his father, whom Renardo described as “a very funny guy.” The last time Renardo saw his father prior to the accident was when his father visited him and gave him support while he went through a divorce. Renardo traveled to South Carolina when he heard the news, and returned on two other occasions prior to his father’s death. Renardo was present when his father died. He is coping with the pain of his father’s death with religion, and has had a couple of dreams about his father.
Counsel for Gloria Lovell and Joann Ahmed next called a clinical medical psychologist, Marie Ann DiCowden, to testify regarding her evaluations of Gloria Lovell and Joann (Joann had not testified yet). DiCow-den’s primary area of work is on patients coping with losses by death, trauma and/or chronic disease. DiCowden testified that a sudden death, as in the instant case, complicates the grieving process, as does the fact that Mr. Gresham lived for twenty-nine days after the accident, which compounded the grief. She said that the loss of a parent is “an extremely impactful and powerful event[,]” especially when it is unanticipated.
DiCowden examined Gloria and Joann, and testified that, in her opinion, Gloria was suffering from an adjustment disorder. DiCow-den said that Gloria had developed a desire to grow closer to the decedent prior to his death, and that she was dealing with a lot of unfinished business with her father. DiCow-den testified that Joann was also suffering from an adjustment disorder, with depression and resulting physical symptoms. Her symptoms included shortness of breath, heaviness on her chest, sleep difficulty, stomach problems, and headaches. DiCowden said that Joann was very close to her father, who was the constant male presence in her life. On cross examination, DiCowden said that Joann may benefit from treatment, but that such would not be beneficial to Gloria. DiCowden found, during the course of her testing, that Joann had a long standing depression, and a preexisting history of anxiety attacks.
Wyman Gresham, the youngest son at twenty-four years old, testified after DiCow-den. He said that during his childhood, even after his parents divorced, he saw his father on a daily basis, and worked with him in the lawn business. When Wyman married in 1989, his father was the only family member to approve, and to attend the wedding. His father furnished Wyman’s apartment after he married, and Wyman talked to him all the time over the phone.
Wyman was on active duty in the army, stationed in Colorado Springs, at the time of the accident. He flew to South Carolina as *1058 soon as he could, and stayed there until his father died. Four days before he died, the decedent opened his eyes and grabbed Wy-man. Wyman was able to tell his father that he loved him. Since his father’s death, Wy-man has had dreams about his father, and constantly thinks about him.
Elvie Gresham, the thirty-four year old daughter of the decedent, testified she recalled that she would ride in her father’s pickup truck as a child, and that her father sent her to Washington D.C. when she was in middle school. She described her father as a very hard worker, whom she worked with at times in the lawn business. After her parents divorced, she still saw her father almost ■every day. Elvie said that her father was close to her daughter, who would get jealous when the other grandchildren referred to the decedent as granddad.
Elvie went to South Carolina after the accident, and stayed there for all but five days while her father was hospitalized. After her father died, Elvie moved into his home. She says that she still has pain, but she suppresses it so she can work. Elvie misses her father’s humor, and the playful teasing that they shared.
Joann Gresham Ahmed was the last of Mr. Gresham’s children to testify. Joann was forty-two at the time of trial, and employed by the Postal Service. She was appointed the personal representative of the decedent’s estate. Joann saw her father all the time while growing up. After he divorced Joann’s mother, the decedent would pick up the children for the weekend, and see them about three or four days a week. During the years just prior to her father’s death, she saw her father two or three times a week. He was a funny, hard-working man who would sometimes wake Joann up in the morning and fix her breakfast.
Joann said she flew up to South Carolina with the other family members the day after hearing about the accident. She stayed there for about a week and a half, and during that time she had phone contact with Gloria. She had to return to Fort Lauderdale for a couple of weeks, but went back to South Carolina during her father’s final days, and was present when her father died.
Joann said her work suffered after her father’s death, and that she thinks about him all the time. She listens to tapes of her father singing in the choir so that she can hear his voice. At this point in her testimony, the court ordered the jury removed, and observed that the crying was getting to be prolonged. When the jury returned, the trial court once again reminded it that sympathy should be disregarded. Joann continued to testify about how she was coping with the help of the church.
Appellants called Nancy Bacher as an expert in clinical psychology. Bacher has developed an expertise in the field of bereavement. She did a psychological assessment on all seven of the children, but was questioned only as to Joann. Bacher testified that Joann’s work problems could be related to her having to resolve conflicts between the two families, and the pressures of dealing with the estate. She said Joann’s symptoms were brought on by multiple factors, one of which was the death of her father. Bacher testified that the facts in this case do not fit into a situation of “sudden death.” The twenty-nine days the decedent lived after the accident gave the family time to grieve, and they were comforted by the fact that then-father knew they cared. Bacher said that the two most disruptive losses to a person are the loss of a spouse, and of a child. On cross examination, Bacher agreed that it was very traumatic for the family members to see their father so grievously injured. She acknowledged that the grieving process could last over seven years.
Following Bacher’s testimony, appellees read into evidence the deposition of Glen Caddy, a clinical psychologist who examined five of the siblings in the Gresham family (Elvie, Randy, Renardo, Joel, and Wyman). He said that Wyman and Elvie were the hardest hit by their father’s death. According to Caddy, Wyman’s loss was that he was just beginning to know his father as an adult. Caddy found Elvie to be distressed over her father’s death, diagnosing her as the most depressed sibling, and in a “reactive depression.” Joel was having a difficult time adjusting to the loss of his father due to the *1059 nature of his work as an artist, but he did not have any severe emotional disorders. When discussing Renardo, Caddy said that he was impressed that none of the children had gotten into any drug or legal problems. Renar-do was getting pleasure from the fact that prior to his death, his father was growing closer to all of his children. Finally, Randy felt there was a lot of unfinished business between him and his father, and that he has some unresolved feelings. However, Caddy felt Randy has coped the best with the loss.
After Caddy’s deposition and the life expectancies of the children were read into evidence, the parties proceeded to closing arguments, during which appellees’ counsel suggested to the jury an award of $500,000 for each child whereas appellants’ counsel suggested a total award for all of the children of $350,000. After the verdict, the trial court denied appellants’ motion for new trial and/or remittitur.
To begin with, we are not aware of any Florida appellate cases involving the issue of exeessiveness of an award to an adult child under section 768.21(8), Florida Statutes (Supp.1990). In the instant case, the jury awarded each child, including the stepdaughter Gloria, an award of $400,000. Appellants assert that the equal awards indicate that the jury did not reach its verdict in a logical and reasonable manner. Although appellants assailed Gloria throughout the trial, they barely, if at all, advocated a lesser award to her in their closing argument. Interestingly, appellants suggested a figure to the jury, $350,000, that neatly divides into seven equal amounts: $50,000. They repeatedly told the jury that it would have to decide how to allocate the damages among the children.
Next, the verdict must be looked at to determine whether the record affirmatively shows that it is excessive. The award in this case, which totals over $2.8 million dollars, is indeed a generous award. However, “[n]ot every verdict which raises a judicial eyebrow should shock the judicial conscience.” Laskey v. Smith, 239 So.2d 13, 14 (Fla.1970). The decedent, for whose death appellants accept responsibility, left behind seven children. These seven children suffered losses as a result of the death of their father, and each deserves to be compensated. If the decedent had but one child, and the jury returned a verdict of $400,000, the damages award may not appear as excessive as $2.8 million seems to be at first glance.
A review of the evidence shows that the seven children have suffered greatly from the loss of their father. The evidence of their loss and remorse went largely uncon-tradicted by appellants, with the exception of that concerning Gloria. Yet, there is evidence to support a finding that Gloria has suffered a loss equal to that of the other children, and that she was growing closer to her father through the final years of his life. Gloria, an ICU nurse, was uniquely aware of her father’s suffering during his final days. Also, circumstances in her life prevented her from traveling to South Carolina before her father died. While there is contradictory evidence, most notably the fact that Gloria was not given anything from the decedent’s will, it is the jury’s function to sort through the conflicting evidence. The jury presumably felt that Gloria’s loss, while possibly in the category of “what might have been,” was as genuine and real as those of the other children.
The record shows that none of the children have sought professional counseling to deal with their loss, but there is evidence that each has been affected by the loss. Appellants did present an expert witness to attempt to show that despite the obvious pain endured by the surviving adult children, it was natural under the circumstances. This expert testified almost exclusively as to Joann’s condition. The jury could have chosen to not place much credence in her testimony.
In closing arguments, appellees’ attorneys sought an award of $500,000 for each adult -child. “[A] jury might properly award damages equal to or in excess of those requested by counsel in closing argument.” Lopez v. Cohen, 406 So.2d 1253, 1256 (Fla. 4th DCA 1981). However, it is common practice for attorneys to suggest damages well in excess of the amount that could be sustained under the facts in the case. Gresham v. Courson, 177 So.2d 33 (Fla. 1st DCA 1965). In the instant case, appellants disputed appellees’ *1060 figure, but did not object to it. They do not assert that the injection of the figure was prejudicial error, and the $500,000 figure was neither challenged nor disapproved of by the trial court. The trial court did not find it deceptive or improper. Cf. Braddock v. Seaboard Air Line Railroad, 80 So.2d 662 (Fla.1955) (supreme court did not pass on appropriateness of per diem method of calculating damages for future pain and suffering since it was not challenged or found to be improper below). The jury’s award was within the range argued to it by the parties.
Finally, the five criteria of the remittitur statute, section 768.74(5), should be considered by this court in determining whether it should order a remittitur or a new trial. Although the aggregate amount of the award is quite high, appellants have not demonstrated that the award was the result of prejudice, passion, or corruption on the part of the jury. There were emotional outbursts during the trial, but the trial court took adequate measures, including curative instructions, to deal with them.
Given the fact that the jury award fell within the range argued by the parties, there is no indication that the jury ignored evidence or misconceived the merits of the cause of action, or that it arrived at the amount through speculation. Appellants’ argument concerning the impact of Amtrak’s recent history of accidents is worthy of consideration, but they have not demonstrated that this factored into the jury’s deliberations in this case. There is no evidence that the jury reached its verdict in an illogical manner.
One factor to be considered under section 768.74(5) is whether the amount bears a reasonable relation to the amount of damages proven in the case. As previously discussed, the record reflects that the surviving children feel a deep loss from the death of their father. Although none of them suffered extraordinary psychological problems that can be traced exclusively to their father’s death, the testimony reflects that each child suffered some mental anguish. Also, the decedent was gravely injured in the derailment, and died after twenty-nine days in a hospital. All the children, except Gloria, saw the decedent’s suffering prior to his death. This could have contributed to the jury’s verdict.
In this case, the jury properly performed its duty, proving again that the system works. While the trial court observed it would not have awarded the same amount, it correctly refrained from acting as a “seventh juror” and granting a remittitur on this basis. It specifically stated that remittitur was not the proper remedy in this case. Although Amtrak was the recipient of a barrage of unfavorable press in the period leading to the trial, particularly in Broward County, appellants did not seek a continuance or a change of venue. The fact that the newspapers were full of unfavorable articles, or that the jury panel was aware of other Amtrak accidents, does not demonstrate that the verdict was the product of matters outside the record; and, the trial court did not make such a finding. The jury’s verdict was within the range argued to it by the parties. Liability was uncontested in this case, and appellants chose to limit their case to cursory cross examinations of all the children except Gloria, whom they thoroughly cross examined, the presentation of a single expert witness, and the argument that the children were suffering in merely a normal fashion. Under these circumstances, this court refrains from disturbing the jury verdict, as did the trial court. The damages award is affirmed under the facts of this case.
GLICKSTEIN, SHAHOOD, JJ., and GRIFFIN, JACQUELINE R., Associate Judge, concur.

. Gloria Lovell, the step-daughter of the decedent, and Joann Ahmed are children from the *1056 first marriage, and the other five are offspring from the decedent's second marriage.

. Unless otherwise noted, all ages are at the time of trial.