768 So.2d 1129 (2000)
MBL LIFE ASSURANCE CORP., a New Jersey Corp., Fisher Island Corp., a New Jersey Corp., as the General Partner of Island Developers, a Florida Limited Partnership, Island Developers, Ltd., individually and Michael S. Carter, Appellants,
v.
Guillermo SUAREZ, Jr. as Personal Representative of the Estate of Guillermo Suarez, Sr. and for the benefit of Guillermo Suarez, Jr., Sabrina Suarez Perez, Nathan Suarez and David Suarez, survivors, Appellee.
Nos. 3D99-297, 3D99-360.
District Court of Appeal of Florida, Third District.
August 23, 2000.
Rehearing Denied October 18, 2000.
*1131 Fowler, White, Gillen, Boggs, Villareal & Banker, P.A. and Bonita Kneeland Brown (Tampa), for appellant.
Chonin & Sher, P.A., and Neil Chonin, and Marilyn Sher, Coral Gables; Bruce S. Rogow and Beverly A. Pohl (Ft.Lauderdale); Phillips, Richard, Rind & Navarrete, P.A. and Libby Herrera-Navarrete, Coral Gables, for appellee.
Before SCHWARTZ, C.J., and GREEN and FLETCHER, JJ.
PER CURIAM.
This is an appeal from a final judgment entered pursuant to a jury verdict in favor of the appellee/plaintiff in a wrongful death case. The decedent Guillermo Suarez, Sr. was killed when his twenty-three foot pleasure boat collided with a ferryboat, the Flamingo, that was leaving Fisher Island to return automobiles and passengers to the Miami mainland. The plaintiff sued the appellants who are the owners and operators of the Fisher Island ferry.[1] Following a six-day trial, the jury returned a verdict finding that the ferry was one-hundred percent negligent and that there was no comparative negligence on the part of the decedent, Suarez. The jury awarded the estate ten-thousand dollars ($10,000) for funeral expenses, and one-million dollars ($1,000,000) to each of the decedent's four adult children. The defendants' motions for new trial and remittitur were denied, and a final judgment was entered pursuant to this verdict. For the reasons outlined herein, we reverse this judgment and remand for a new trial on both the issue of liability and damages.
The collision between the decedent's boat and the ferry occurred on September 11, 1996, at approximately 7:45 p.m. The time of day was described as "dusk", since the sun had already begun to set. The eyewitnesses testified that, at the time of the accident, it was not raining nor dark. In fact, the witnesses testified that at the time of the accident, they could see both the water and the area around them.
The ferry, Flamingo, was being piloted by Captain Carter who was in training at the time of the accident. That evening, the ferry did not depart from the main Fisher Island ferry slip because that slip was under repair. Instead, Captain Carter exited from one of Fisher Island's auxiliary or "blind" slips.[2] Captain Carter did not, as is the usual practice, sound the ferry's horn when he exited the slip.[3] As he was leaving the slip, Captain Carter noticed a small vessel approaching the ferry's path. The boat was far away and the captain was not concerned, however a few moments later, when he looked back toward the small boat, he noticed that it was heading directly toward the ferry at a speed of approximately thirty to thirty-five miles per hour. Before Captain Carter could sound the required "danger-doubt" *1132 five blast signal, Suarez's boat collided with the ferry.[4]
Robert Loeser, the plaintiff's accident reconstruction expert explained that the accident occurred as a result of three events: (1) the failure of the ferry to "sound the long blast coming out [of the slip], which would tell any other boater on the water within a mile, I'm coming out, look for me"; (2) the failure of Captain Carter to sound the "danger doubt" signal once he saw Suarez's boat; and (3) the poor lighting on the outer rail of the ferry. However, Loeser also admitted that if Suarez had seen the ferry, he had the ability to "turn [the boat] on a dime" to avoid a collision.
Dr. Lee Schwanger, an engineer and accident reconstruction expert, testified for the defendants. He opined that Suarez had an unimpeded line of sight with regard to the ferry, and that there was no physical structure between Suarez's boat and the ferry for at least forty seconds prior to the collision. Based on the physical evidence, Schwanger believed that Suarez's boat was most likely traveling at twenty-five knots. Thus, Dr. Schwanger calculated that Suarez should have seen the ferry at least thirty-six seconds prior to the collision if Suarez had been looking in the direction in which he was steering his boat.
Thus, based upon the expert testimony from both sides, what transpired during these thirty-six seconds appears to be critical to the resolution of this case. The exclusion of certain evidence by the trial court regarding events transpiring immediately preceding the collision, is the basis for the first issue on this appeal.
The defendants assert that the trial court erred in disallowing evidence of a prior inconsistent statement, given by Nery Saez, Suarez's girlfriend, who was a passenger on the boat when it collided with the ferry. The defendants claim that Saez's statement, taken a day after the accident, would have shown that at the time of the collision, Suarez was looking into the helm of the boat, rather than the water, and therefore did not see the ferry before he struck it.

Nery Saez's Statement
On the day following the collision, the Coast Guard questioned Nery Saez about the circumstances leading up to the collision. The witness summary, written by the Coast Guard officer provides:
Ms. Saez states that she was a passenger on the small vessel involved in the collision. She recalls that she and the operator of the vessel were returning from Bakers Haulover (North Miami Beach F1) after picking up lobster traps. The vessel followed a route southbound off Miami Beach (Atlantic Ocean) and then entered Government Cut. Shortly before entering Government Cut she went inside the cuddy cabin due to rain. She recalled sitting in the cabin, facing aft, having a conversation with the operator. The operator was reported to be on the starboard side of the vessel at the helm, looking down at her. During the conversation with the operator the "boat exploded" and began flooding rapidly. She did not recall seeing the operator of the boat because she was focusing on the only light she could see, while attempting to escape. She continued making her way to the light and finally was able to escape. She does not recall the route she used to egress from the vessel. The next thing she remembers was someone holding her up in the water. She then was taken to the hospital where she was examined and released. *1133 During the course of the interview Ms. Saez drew a sketch of the layout of the vessel depicting the positions of herself and the operator and drew a line from the operator to her position to illustrate where the operator was looking. (Emphasis added)
This statement, along with additional documentation in the Coast Guard record, is documented "under seal" by the United States Coast Guard records custodian E.D. Dennely, Lt. J.G., U.S. Coast Guard Investigating Officer. It is authenticated as an official record by both Dennely and R.D. Kirk, Lieutenant Commander, U.S. Coast Guard, Senior Investigating Officer.
Prior to trial, the defendants took a discovery deposition of Ms. Saez. During that deposition, she testified that at the time of the accident, she did not see where Suarez was, or what he was doing, because she had fallen asleep. Saez stated that it was the "explosion" that woke her up. In answering a question posed by the defendants' counsel, Saez testified that she did not recall having spoken to the Coast Guard, even though her daughter reminded her that she had. Instead, Saez testified that she only remembered that there was a lot of commotion that morning, since everyone was still searching for Suarez.
On October 29, 1998, nearly thirty days after being served with the trial subpoena and a mere four days before trial was to begin, Saez's personal attorney filed a motion for protective order from the defendants' trial subpoena. The basis for the motion was that Saez had chronic and severe post-traumatic stress disorder arising from the death of her fiancee; that she was under the care and treatment of both a psychologist and psychiatrist for her problems; that her coping skills were extremely poor and that testifying about the accident could be potentially life threatening to her.[5] The trial court granted the protective order, and told the plaintiff that Saez's deposition could be used in lieu of her live testimony.
The defendants argued that since Saez had been excused from testifying at trial, her failure (in her deposition) to acknowledge any prior statement to the Coast Guard after the accident was an appropriate predicate for establishing her prior statement as admissible inconsistent testimony. The plaintiffs attorney argued that the proper predicate had not been made at Saez's deposition to enable the defendants to use her prior inconsistent statement. The trial court ruled that the defendants could bring a member of the Coast Guard investigation staff to testify as to what was said in the report and Saez's state of mind.
The Coast Guard took the position that its investigator could not testify. A letter from the Coast Guard stated that the Code of Federal Regulations imposed significant legal constraints on past or present members of the Coast Guard. The letter further stated that if the investigator was permitted to testify, her testimony would be limited to a single deposition. The Coast Guard Commander further stated that, even without the investigator's testimony, "the notes taken of Ms. Saez's interview could be used to impeach Ms. Saez's trial testimony as a prior inconsistent statement." The trial court acknowledged that Saez's statement to the Coast Guard was completely contrary to her deposition testimony and that it had granted the protective order to Saez on the basis that she had given a deposition. Nevertheless, the court ruled that it would not allow evidence of the prior inconsistent statement unless plaintiff's counsel had an opportunity to cross-examine the Coast Guard investigator.
A telephonic deposition of the Coast Guard investigator was set immediately preceding the commencement of trial. *1134 Due to a "comedy of errors" in properly noticing the deposition, plaintiffs counsel did not receive notice of the deposition and therefore did not participate. Although the Coast Guard investigator testified at deposition that the statement in the written summary was an accurate reflection of her conversation with Saez, the trial court disallowed the deposition testimony on grounds that plaintiffs counsel was not present to question the investigator about Saez's mental state at the time of the interview. More importantly, however, the trial court also disallowed the use of Saez's statement to the Coast Guard at the trial which the defendants argue should have been allowed as a prior inconsistent statement.
The Florida Evidence Code regarding prior inconsistent statements of witnesses provides:
(1) When a witness is examined concerning the witness's prior written statement or concerning an oral statement that has been reduced to writing, the court on motion of the adverse party, shall order the statement to be shown to the witness or its contents disclosed to him or her.
(2) Extrinsic evidence of a prior inconsistent statement by a witness is inadmissible unless the witness is first afforded an opportunity to explain or deny the prior statement and the opposing party is afforded an opportunity to interrogate the witness on it, or the interests of justice otherwise require. If a witness denies making or does not distinctly admit making the prior inconsistent statement, extrinsic evidence of such statement is admissible ...
§ 90.614, Fla. Stat. (1995).[6]
At her discovery deposition, the defendants asked Saez about the statement that she had made to the Coast Guard the morning following the accident. Saez stated that she had no recollection of making such statement, although she admitted in her deposition that her daughter reminded her that she had done so.[7] When a witness states that she does not recall questions asked or answers given at a previous time, the law provides that extrinsic evidence of the prior statement is admissible. See Pugh v. State, 637 So.2d 313 (Fla. 3d DCA 1994)(where witness did not remember questions asked or answers given regarding his previous "critical testimony," section 90.614(2) allows the admission of extrinsic evidence of the "critical testimony."); see also § 90.614(2), Fla. Stat.("[i]f a witness ... does not distinctly admit making the prior inconsistent statement, extrinsic evidence of such statement is admissible").
During her deposition, Saez was given an opportunity to explain why she did not recall her statement to the Coast Guard, and her only answer was that there was too much confusion going on at the time. Moreover, plaintiffs counsel had the opportunity to question Saez about her state of mind, when she gave the statement to the Coast Guard, but chose not to do so. In any event, at the deposition, the defendants identified the time, place, and *1135 entity taking Saez's prior statement and she claimed that she had no recollection of making the statement. This was a sufficient predicate under section 90.614(2) to allow for the admission of Saez's prior inconsistent statement. See Thornes v. State, 485 So.2d 1357, 1358-59 (Fla. 1st DCA 1986)(holding that it is not necessary to pursue the contents of a prior inconsistent statement of which witness denies knowledge).
The trial court, therefore, erred when it required the defendants to produce the Coast Guard's investigating officer to testify about Saez's "state of mind." "In order to prove the making of a prior statement it is necessary to call a person who was present when the statement was made to testify to what was said or written, or to use some other acceptable method of authentication. (Emphasis added)" See C. EHRHARDT, FLORIDA EVIDENCE § 614.1 at 523 (1999 ed.). Thus, the purpose in satisfying the requisites of section 90.614, is to prove that the statement is authentic. Under section 90.902, the prior statement of Saez, which was under official seal within the Coast Guard's report, is a public document which is self-authenticating and therefore, should have been admitted as a prior inconsistent statement. See § 90.902, Fla. Stat. (1995).[8]See also, e.g., Fox v. United States, 934 F.Supp. 1133, 1136 (N.D.Cal.1996)(Coast Guard investigatory report regarding incident could be admitted into evidence in wrongful death and negligence action); In re Nautilus Motor Tanker Co., Ltd., 862 F.Supp. 1251, 1255 (D.N.J.1994)(Coast Guard investigatory report, where the Coast Guard was not a party, was deemed trustworthy and therefore admissible).
Moreover, even if the defendants did not meet the foundational requirements of section 90.614(2), which we find they did, the prior inconsistent statement should still have been admitted into evidence because "the interests of justice" otherwise required it. See § 90.614(2). See also Thornes v. State, 485 So.2d at 1359 (technical noncompliance with section 90.614 may be excusable, in the interests of justice); State v. Crowley, 1987 WL 11247 (Ohio Ct.App.1987)(no foundation is required if the interests of justice would be defeated by the imposition of the foundational requirements).
It has long been recognized that
the purpose of our adversarial system is to enhance the search for truth. See Allstate Ins. Co. v. Boecher, 733 So.2d 993, 995 (Fla.1999)("Only when all relevant facts are before the judge and jury can the `search for truth and justice' be accomplished." (Emphasis in original)); Dodson v. Persell, 390 So.2d 704, 707 (Fla.1980); D'Auria v. Allstate Ins. Co., 673 So.2d 147 (Fla. 5th DCA 1996) (Antoon, J., concurring)("Trial judges have the important responsibility of ensuring that trials maintain their function as forums for the search of truth."). To this end, section 90.402, Florida Statutes (1997), provides that "all relevant evidence is admissible, except as provided by law."[9] It seems clear that the goal of the search for truth is to bring before the fact-finder as much relevant evidence as possible to assist in the deliberative process. (footnote added)
Diaz v. State, 747 So.2d 1021, 1025-26 (Fla. 3d DCA 1999). It is undisputed that Saez was the only witness that directly interacted with the decedent prior to the collision. Therefore her statement of what *1136 occurred immediately prior to the collision was clearly relevant and should have been admitted.
Moreover, the plaintiff used Saez's deposition testimony to his own advantage. Saez testified that Suarez was not, and could not have been, speeding in the channel prior to the accident because the boat was weighted down by fishing traps. Therefore, the jury was left with the impression that Suarez was traveling at a safe rate of speed, thereby negating any inference of negligence. The jury also heard, via Saez's deposition, that she was sleeping at the time of the accident and therefore had no idea what Suarez was doing during the thirty-six seconds prior to the collision.
Clearly, it would only have been fair, and justice could only be served, if the defendants were given the opportunity to impeach Saez's credibility by showing that she had previously stated that Suarez was talking to her at the time of the collision. See Branca v. Security Benefit Life Ins. Co., 773 F.2d 1158, 1160 (11th Cir.1985)(holding that "[t]he general purpose of the Federal Rules of Evidence and the interests of justice must best be served by admission of the statement into evidence."), modified on other grounds, 789 F.2d 1511 (11th Cir.1986).
Because the trial court had no legitimate reason for preventing the jury from hearing Nery Saez's prior inconsistent statement, and because the failure to do so clearly was not harmless and kept the jury from considering all of the relevant evidence in this case, we find that the trial court clearly abused its discretion.

Damages
The defendants next argue that the damages awarded to the decedent's adult children were clearly excessive given their independent status and their strained relationship with their father at the time of his death. We agree.
The jury returned a verdict awarding one-million dollars to each of the decedent's four adult children. At the time of Suarez's death, none of his children were residing with him. Nor were any of them financially dependent upon him for support. The sole element of damages was the children's grief and loss of instruction. The undisputed evidence at trial, however, indicated that the children's relationship with their father had deteriorated somewhat because of his relationship with Saez. All of the children admitted that their visits and relationships with their father had diminished considerably with the onset of his relationship with Saez.
Given this evidence, we find that the one-million dollars awarded to each of Suarez's adult children could only have been "a product of passions and emotions," rather than a result of the evidence presented. Harbor Ins. Co. v. Miller, 487 So.2d 46, 48 (Fla. 3d DCA 1986). As the Supreme Court of Florida stated in Florida Patient's Compensation Fund v. Von Stetina, 474 So.2d 783 (Fla.1985), "[m]ere sympathy cannot sustain a judgment. A juror is charged with the duty to weigh evidence and to find fact. The jury system should not function on emotion, but on logic." Id. at 790.
In support of this verdict, the plaintiff cites us to National Railroad Passenger Corporation v. Ahmed, 653 So.2d 1055 (Fla. 4th DCA 1995). We find Ahmed, however, to be distinguishable from this case. In Ahmed, a case which involved wrongful death damages to adult children under section 768.21(3), Florida Statutes (1990), the fourth district affirmed an award of $400,000 to each adult child, even though it recognized that it was "indeed a generous award." Id. at 1059. The court however justified and upheld the award because the evidence of the adult children's loss went "largely uncontradicted" at trial. Id. Furthermore, the Ahmed court noted that there was testimony by experts that the children were suffering from adjustment disorders and depression after the loss of their father. Finally, the fourth district noted that all of the children *1137 in Ahmed, save one, witnessed the decedent's suffering for twenty-nine (29) days prior to his death, and found that this may have contributed to the jury's award. Id. at 1060.
Other than the fact that this case involves surviving adult children in a wrongful death action, this case bears little similarity to Ahmed. The evidence in this case of the children's loss was vehemently contested, there was no evidence presented that showed that these children were suffering from adjustment disorders or depression. Finally, Suarez did not suffer, in front of his family, in the time preceding his death.
Thus, for the foregoing reasons, we are compelled to reverse the final judgment and remand for a new trial on both liability and damages. The remaining issues raised on this appeal either lack merit or are rendered moot by this decision.
Reversed and remanded.
NOTES
[1] The original defendants were MBL Life Assurance Corporation, as owner of the ferry "Flamingo," Fisher Island Corporation, as general partner of Island Developers, Ltd. Partnership, which operated the ferry, Island Developers, individually, and Michael S. Carter, the captain of the ferry. They will be referred to collectively as "the Defendants." Captain Carter was dismissed, without prejudice, prior to the trial.
[2] As Captain Luis Castro testified at trial, the difference between the main slip and the auxiliary slip was that with the auxiliary slip, "you have restricted visibility until you actually pop out of the slip."
[3] The testimony was undisputed that when a ferry, or any power driven vessel, is leaving a slip, it should sound one prolonged blast of its horn as it is exiting.
[4] Rule 34(d), of the Inland Navigational Rules, provides:

When vessels are in sight of one another, are approaching each other and from any cause either vessel fails to understand the intentions or action of the other, or is in doubt where the sufficient action is being taken by the other to avoid collision, the vessel in doubt shall immediately indicate such doubt by giving at least five short and rapid blasts on the whistle. This signal may be supplemented by a light signal of at least five short and rapid flashes.
[5] The motion for protective order was accompanied by the affidavit of Dr. Elena Coello-Jemmali, Saez's treating psychologist, who attested that it was her opinion and strong recommendation that Saez not testify about the accident due to her post-traumatic stress disorder symptomology, her grief, and her numerous medical problems.
[6] Federal Rule of Evidence 613, closely resembles Florida's evidence rule on prior inconsistent statements, and provides:

Rule 613. Prior Statements of Witnesses
(a) Examining witness concerning prior statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.
(b) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require....
[7] Because it was a discovery deposition, and not a deposition taken for use at trial, defense counsel was not required to present Saez with her prior statement and/or to ask about its contents.
[8] Section 90.902 provides in pertinent part:

Extrinsic evidence of authenticity as a condition precedent to admissibility is not required for:
(1) A document bearing:
(a) A seal purporting to be that of the United States or any state, district, commonwealth, territory, or insular possession thereof; the Panama Canal Zone; the Trust Territory of the Pacific Islands; or a court, political subdivision, department, officer, or agency of any of them; ...
[9] The 1996 version of this rule reads exactly the same.