BENTON, C.J.
As personal representative of the estate of her father, James Cayce Horner — a long-time smoker of cigarettes manufactured by R.J. Reynolds Tobacco Company (RJR) who died of lung cancer — Diane Webb filed a wrongful-death action against RJR alleging membership in the class described in Engle v. Liggett Group, Inc., 945 So.2d 1246 (Fla.2006), strict liability, fraud by concealment, conspiracy to com *333 mit fraud by concealment, and negligence. After the trial court entered judgment in her favor and against RJR for $79,200,000 ($7.2 million in compensatory damages and $72 million in punitive damages), RJR appealed. Ms. Webb did not pursue her cross-appeal. We do not disturb the judgment as to liability, but we vacate the damages award and remand for further proceedings.
I.
RJR argues for reversal on multiple grounds. It contends that (1) the trial court dealt with its statute of limitations defense improperly; (2) the compensatory damage award should be set aside as excessive or be remitted; (3) the punitive damage award should be set aside because the trial court erred in permitting the jury to rely on the Engle findings in determining entitlement and as excessive, or should at least be remitted; (4) the statute of repose and federal preemption operate in combination to bar all concealment and conspiracy claims; (5) Ms. Webb failed to prove Mr. Horner reasonably relied on any statement or omission by any Engle defendant; and (6) use of the Engle findings to establish elements of Ms. Webb’s claims violated Florida law and state and federal due process requirements.
H.
On the basis of recent, definitive precedent, we summarily reject RJR’s last three arguments. First, as regards the combined effect of the statute of repose and federal preemption, we are bound by our supreme court’s decision in Carter v. Brown & Williamson Tobacco Corp., 778 So.2d 932, 940 (Fla.2000) (concluding the Public Health Cigarette Smoking Act of 1969 does “ ‘not preempt petitioner’s claims that rely solely on respondent’s testing or research practices or other actions unrelated to advertising or promotion,’ ” “ ‘does not preempt fraudulent misrepresentation claims,’ ” and “ ‘does not preempt conspiracy to defraud claims’ ” (quoting Cipollone v. Liggett Group, Inc., 505 U.S. 504, 524-30, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992))). See also Laschke v. Brown & Williamson Tobacco Corp., 766 So.2d 1076, 1079 (Fla. 2d DCA 2000) (“In claims alleging conspiracy, the critical date for statute of repose purposes should be the date of the last act done in furtherance of the conspiracy.”).
Applying the doctrine of stare decisis, we also reject RJR’s argument that Ms. Webb failed to establish her father’s reliance on RJR’s (mis)statements and omissions concerning the effects smoking tobacco can have on smokers’ health. Here as in R.J. Reynolds Tobacco Co. v. Martin, 53 So.3d 1060, 1069 (Fla. 1st DCA 2010), review denied, 67 So.3d 1050 (Fla.2011), “the record contains abundant evidence from which the jury could infer [Mr. Hor-ner’s] reliance on pervasive misleading advertising campaigns ... and on the false controversy created by the tobacco industry during the years he smoked aimed at creating doubt among smokers that cigarettes were hazardous to health.” Finally, our decision in Martin forecloses RJR’s argument that using the Engle findings in establishing elements of Ms. Webb’s claims violated both Florida law and federal and state due process requirements. See id. at 1066-69.
III.
Nor do we find merit in RJR’s argument that the trial court improperly rejected its statute of limitations defense. RJR argued the action was time-barred under the statute of limitations by virtue of the “first-injury rule,” invoking “the long-standing rule generally applicable to personal injury claims [that] ‘the cause of *334 action accrues and the statute [of limitations] begins to run from the time when the injury was first inflicted, and not from the time when the full extent of the damages sustained ha[s] been ascertained.’” Larson & Larson, P.A. v. TSE Indus., Inc., 22 So.3d 36, 42 (Fla.2009) (quoting Seaboard Air Line R.R. Co. v. Ford, 92 So.2d 160, 164 (Fla.1956)). RJR maintained that Mr. Horner knew or should have known, prior to May 5, 1990 (more than four years before the class action in Engle was filed on May 5, 1994), that he had chronic obstructive pulmonary disease (COPD), and that any claim based on any injury from smoking — including lung cancer — accrued as soon as he became aware — or should have become aware — of COPD. The trial court ruled that knowledge of COPD did not, as a matter of law, put him on notice of the cancer to which he eventually succumbed.
We find no error in this ruling. It comports with the Third District’s rationale in Eagle-Picher Industries, Inc. v. Cox, 481 So.2d 517 (Fla. 3d DCA 1985), where a plaintiff who suffered from asbestosis, but not cancer, sought to recover damages not only for asbestosis but also for the enhanced risk of cancer as the result of exposure to asbestos. After a scholarly discussion of the rule against splitting causes of action,[1] the Eagle-Picher court concluded that “to permit an action for cancer only if and when it occurs most assuredly promotes judicial economy by discouraging the filing of anticipatory lawsuits and the concomitant protraction of pending lawsuits so as to allow the still inchoate cancer claim to ripen.” Id. at 521.
The court observed that asbestosis and cancer are medically distinct diseases even though they may emanate from the same exposure to asbestos. Id. at 522. Noting thousands of pending asbestos claims and the long latency period for asbestos-related cancer, the court concluded:
Given the immensity of the demands made and yet to be made upon asbestos litigation defendants, the finite resources available to pay claimants in mass tort litigation, and the real danger that overcompensation of early claimants who may not contract cancer will deplete these finite resources to the detriment of future claimants who do, public policy requires that the resources available for those persons who do contract cancer not be awarded to those whose exposure to asbestos has merely increased their risk of contracting cancer in the future. Eliminating the future risk of cancer as a compensable damage, and permitting an action for later discovered cancer to be independent of any claim for damages, prosecuted or not, on account of asbestosis, will, it is to be hoped, prevent a drain on the assets which could be used to compensate actual cancer victims.
Id. at 525-26. Our supreme court stated with regard to tobacco in Carter, 778 So.2d at 936-37:
Lung cancer caused by smoking is a latent or “creeping disease.” See Copeland v. Armstrong Cork Co., 447 So.2d [922, 926 (Fla. 3d DCA 1984) ] (stating *335 that a latent or “creeping” disease is a disease acquired over a period of years as a result of long-term exposure to injurious substances); see also Brown & Williamson Tobacco Corp. v. Young, 690 So.2d 1377, 1379 (Fla. 1st DCA 1997) (a latent disease is “difficult to pinpoint when and where it began”).
“[Mjanifestation’ of a latent injury in a products liability claim occurs when the plaintiff is on notice of a causal connection between exposure to the allegedly defective product and the resultant injury.” Barnes v. Clark Sand Co. Inc., 721 So.2d 329, 332 (Fla. 1st DCA 1998).
Smoking cigarettes may cause more than one kind of injury. See Pooshs v. Philip Morris USA, Inc., 51 Cal.4th 788, 123 Cal.Rptr.3d 578, 250 P.3d 181, 190-91 (2011) (concluding that “when a later-discovered latent disease is separate and distinct from an earlier-discovered disease, the earlier disease does not trigger the statute of limitations for a lawsuit based on the later disease” and therefore “no good reason appears to require plaintiff, who years ago suffered a smoking-related disease that is not lung cancer, to sue at that time for lung cancer damages based on the speculative possibility that lung cancer might later arise”).
Applying Rhode Island law in Nicolo v. Philip Morris, Inc., 201 F.3d 29, 35 (1st Cir.2000), the court noted that requiring a strict application of the rule against splitting causes of action “would place, as other courts have observed, a victim in an impossible position.”
If he did not sue at the earliest onset of breathing difficulty or emphysema, he would risk being barred from pursuing a remedy for a cancer condition discovered much later. If, on the other hand, he brought suit at such an early stage he would not be able to come forward with the proof of sufficient likelihood of damage from cancer to sustain his cause of action.... As then-Judge Ginsburg wrote in Wilson v. Johns-Manville Sales Corp., 684 F.2d 111 (D.C.Cir.1982): “In latent disease cases, this community interest [in balancing the interests of the parties and producing a fair resolution] would be significantly undermined by a judge-made rule that upon manifestation of any harm, the injured party must then, if ever, sue for all harms the same exposure may (or may not) occasion some time in the future.” Id. at 119.
[[Image here]]
We, therefore, are confident that a Rhode Island court would not deem cancer to be so foreseeably related to the very beginning of plaintiffs respiratory difficulties as to identify that as the time of accrual of her cause of action for cancer.
Id. The First Circuit recited “a number of characteristics of cancer that militate against requiring a possible victim, even though an addicted smoker, to make an early decision to commence litigation. The causes of cancer are various, by no means confined to prolonged smoking. Nor is cancer an inevitable result of such smoking. Often its incidence defies foreseeability. It is quite different from afflictions of shortness of breath, emphysema, or other respiratory difficulties. It is of a different magnitude.... Unlike impairments to breathing, cancer does not lend itself to lay identification.” Id. at 36.
In the present case, the controlling question was when Mr. Horner knew or should have known that he had smoking-related lung cancer, not COPD, and the trial court so ruled. RJR did not establish that merely learning of his COPD diagnosis meant Mr. Horner knew or should have known he had lung cancer. A person with COPD may or may not develop lung cancer, according to evidence the trial court *336 was entitled to accept. The evidence was undisputed that Mr. Horner was not diagnosed with lung cancer until 1991; and the parties stipulated that lung cancer caused his death in 1996. The trial court did not err in rejecting RJR’s statute of limitations defense,[2] and we find no other error in the trial court’s determination of liability.
IV.
Finding that Ms. Webb sustained $8 million in compensatory (noneconomic) damages and that RJR was 90% responsible for Mr. Horner’s death, the jury awarded an additional $72 million in punitive damages. In the aggregate, the award was $79.2 million. The trial court denied RJR’s motions for new trial or remittitur, and entered judgment on the verdict.
Courts should not “allow a jury to award a greater amount of damages than what is reasonably supported by the evidence at trial.” McCarthy Bros. Co. v. Tilbury Constr., Inc., 849 So.2d 7, 9 (Fla. 1st DCA 2003). Upon the filing of RJR’s motion for new trial or remittitur, the trial court had to review the amount of damages to determine if the award was excessive “in light of the facts and circumstances which were presented to the trier of fact.” § 768.74(1), Fla. Stat. (2010). In determining whether an award is excessive, a trial court is required to consider the following criteria:
(a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
(b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
(c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;
(d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and
(e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.
§ 768.74(5), Fla. Stat. (2010). “The Legislature recognizes that the reasonable actions of a jury are a fundamental precept of American jurisprudence and that such actions should be disturbed or modified with caution and discretion. However, it is further recognized that a review by the courts in accordance with the standards set forth in this section provides an additional element of soundness and logic to our judicial system and is in the best interests of the citizens of this state.” § 768.74(6), Fla. Stat. (2010).
Under Florida law, a trial court’s order denying a motion for remittitur is reviewed by an appellate court under an abuse of discretion standard. See Engle, 945 So.2d at 1263; City of Hollywood v. Hogan, 986 So.2d 634, 647 (Fla. 4th DCA 2008). “The trial court does not sit as a seventh juror. Neither does the reviewing court reserve the prerogative to overturn a damages verdict with which it merely disagrees.” Dyes v. Spick, 606 So.2d 700, 702 (Fla. 1st DCA 1992) (citations omitted). “[I]n determining the adequacy of a verdict the reviewing court must decide whether a jury of reasonable men could have returned that verdict. The use of the *337 term ‘reasonable men’ connotes the application of an objective standard, and requires a determination of whether the verdict is actually based upon the law and evidence as presented at trial.” Id. (citing Griffis v. Hill, 230 So.2d 143 (Fla.1969)). “If the jury’s award is so extravagant that it shocks the judicial conscience, or is manifestly unsupported by the evidence or indicates the jury was influenced by passion, prejudice or other matters outside the record, the court in its discretion may set aside the verdict.” Citrus Cnty. v. McQuillin, 840 So.2d 343, 347 (Fla. 5th DCA 2003).
In reviewing an award of damages for excessiveness, the court may consider the philosophy and general trend of decisions in comparable cases. See Aills v. Boemi, 41 So.3d 1022, 1028 (Fla. 2d DCA 2010) (“The comparison of jury verdicts reached in similar cases provides one method of assessing ‘[wjhether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered.’ § 768.74(5)(d).”). See also Johnson v. U.S., 780 F.2d 902, 908 (11th Cir.1986) (“[EJxcessiveness may be tested by comparing the verdict to those damage awards determined not to be excessive in similar cases.”); McQuillin, 840 So.2d at 347 (reviewing “the awards in other cases for loss of a child, parent or spouse” in determining whether award is so excessive as to shock the judicial conscience).
Only noneconomic damages were awarded in the present case. Recovery was authorized “for lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury.” § 768.21(3), Fla. Stat. (1996). Of the thirty-five Engle cases we examined in which the jury awarded compensatory damages,[3] the juries awarded compensatory damages as great as $7 million in only eight cases. Of these eight cases, three were cases in which the plaintiff was the cigarette smoker and the verdicts included economic damage awards.[4] In the others, the decedents died at a much younger age than Mr. Horner did,[5] or were survived by a spouse,[6] by spouse and child,[7] or by two or more children.[8] Our research has failed *338 to uncover a single case in which an adult child received a wrongful death award of this magnitude that was affirmed on appeal (either in Engle progeny cases or other wrongful death actions).[9]
Ms. Webb points to the verdict in Alejandre v. Republic of Cuba, 996 F.Supp. 1239 (S.D.FIa.1997), an award that never received the imprimatur of an appeals court. There Armando Alejandre was on a humanitai’ian mission, searching for rafters in the waters between Cuba and the Florida Keys, when the Cuban Air Force shot down the civilian plane in which he was flying. Forty-five years old at the time of his death, Mr. Alejandre was survived by his wife of twenty-one years and his daughter Marlene, a college student.[10] Id. at 1242-43. His personal representative filed an action against the Republic of Cuba and the Cuban Ah’ Force. The trial court awarded $7,500,000 for mental pain and suffering and $500,000 for loss of companionship and protection to Alejandre’s widow, and $7,500,000 for mental pain and suffering and $500,000 for loss of parental companionship and guidance to Alejandre’s daughter. Neither Cuba nor the Cuban Air Force defended the suit or appealed the judgment. Id. at 1249.
The present case differs in many respects. Experts aside, only four witnesses, including Ms. Webb, testified at trial. All four testified regarding the 1986 death of Ms. Webb’s first husband from a heart attack, the 1993 death of Ms. Webb’s mother from lung cancer, and the death of Ms. Webb’s grandmother (Mr. Horner’s mother) from emphysema. All four of these witnesses attributed all of these illnesses and deaths to cigarette smoking.
The jury also heard much testimony from each of these four witnesses about Ms. Webb’s personal medical difficulties and about the close relationship she had with Mr. Horner and how helpful he was during the life-long illness and death of Ms. Webb’s first-born child. The jury heard that Ms. Webb married when she was nineteen; that she lived with her then husband, a member of the United States Air Force, in England from 1961 through 1963; that their first child, Venetia, was born in 1963 with a rare chromosomal disorder (Trisomy Edwards 18); that her husband was given a compassionate reassignment; that during the ambulance flight from England, the plane was not properly pressurized; and that this resulted in Ms. Webb’s becoming deaf.
The jury heard uncontroverted evidence from which it further appeared: Upon their return from England, when Ms. Webb and her husband lived at Homestead Air Force Base for a year, she could not leave the house unless someone else was in the house with Venetia. She was also experiencing other problems related to her hearing loss during this time. Her mother and father, who lived in Miami, came to Ms. Webb’s house to assist four or five times each week. Later Ms. Webb and her husband purchased a home in Miami, across the street from her parents, and she saw her parents, who continued to help *339 her care for Venetia, every day. Although Venetia required care twenty-four hours a day because of medical and physical problems, no one other than Ms. Webb’s immediate family, including Mr. Horner, cared for her.
Venetia had to be fed like an infant; she was never able to walk or talk, and could not even sit unassisted. When she died in 1977 at the age of thirteen, she weighed only 25 pounds. Without her parents’ assistance, Ms. Webb would not have been able to care for her two younger children, who spent a significant amount of time at Mr. Horner’s home, in part because of Venetia’s medical difficulties. Because Venetia had a compromised immune system, the two younger children would stay at Mr. Horner’s home when they caught colds.
The amount of the compensatory damages suggests an award that is the product of passion, an emotional response to testimony regarding difficulties Ms. Webb and her father faced and overcame before cancer befell him, rather than evidence of his illness, subsequent death, and the noneco-nomic consequences of the death itself. Mr. Horner outlived the grandchild he had been such a help with. Ms. Webb, who was 54 years old when her father died at the age of 78, was not wholly dependent on his companionship, instruction and guidance at that time. She was married, with two adult children and grandchildren, as well.
Although not determinative, the fact that the jury awarded double the amount of compensatory damages requested by Ms. Webb’s counsel and assigned to Mr. Horner half of the percentage of fault her counsel acknowledged during closing argument suggests the jury was influenced by prejudice or passion. While a “ ‘jury might properly award damages equal to or in excess of those requested by counsel in closing argument,’ ... it is common practice for attorneys to suggest damages well in excess of the amount that could be sustained under the facts in the case.” Nat’l R.R. Passenger Corp. (Amtrak) v. Ahmed, 653 So.2d 1055, 1059 (Fla. 4th DCA 1995) (quoting Lopez v. Cohen, 406 So.2d 1253, 1256 (Fla. 4th DCA 1981)). See also Gresham v. Courson, 177 So.2d 33, 39 (Fla. 1st DCA 1965) (“A verdict is not per se excessive because the jury awards the full amount of damages suggested by counsel for the prevailing party, but we would be exceedingly naive should we fail to recognize that as a matter of practice the advocate usually suggests to the jury a figure for damages substantially in excess of the amount that is clearly supportable by the evidence and likewise in excess of the amount which he deems to be supportable in point of law should the jury happen to return a verdict approaching the amount suggested.”). Certainly the compassion Mr. Horner exhibited during his lifetime, and Ms. Webb’s deafness and devotion both to him and her first born, could inspire sympathy and admiration. In the circumstances, however, the compensatory damages award is more than the evidence at trial reasonably supports and “shocks the judicial conscience.” The trial court abused its discretion when it denied RJR’s motion for remittitur or new trial.
Because the award of compensatory damages must be vacated, we also vacate the award of punitive damages. See Engle, 945 So.2d at 1265 (“ ‘[CJourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.’ Thus, the amount of compensatory damages must be determined in advance of a determination of the amount of punitive damages awarda-ble, if any, so that the relationship between the two may be reviewed for reasonableness.” (quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 426,123 *340 S.Ct. 1513, 155 L.Ed.2d 585 (2003)); Brown v. Ford, 900 So.2d 646, 649 (Fla. 1st DCA 2005) (noting that if a new trial on damages is required the “ ‘better practice and procedure requires that one jury determine both the compensatory and punitive damages’ ” (quoting DuPuis v. 79th Street Hotel, Inc., 231 So.2d 532, 536 (Fla. 3d DCA 1970)); Chillemi v. Rorabeck, 629 So.2d 206, 210 (Fla. 4th DCA 1993) (“Since the amount of compensatory damages is being set aside, the better practice is for the punitive damages award also to be reconsidered at the same time. See Stevens Markets, Inc. v. Markantonatos, 189 So.2d 624 (Fla.1966).”).
V.
We reverse both the compensatory and the punitive damage awards and remand the case with directions that the trial court grant the motion for remittitur or order a new trial on damages only. We affirm the judgment in all other respects.
VAN NORTWICK and SWANSON, JJ., concur.

. Our supreme court said in Larson & Larson, P.A. v. TSE Industries, Inc., 22 So.3d 36, 47 n. 7 (Fla.2009), " 'The rule against splitting causes of action makes it incumbent upon plaintiffs to raise all available claims involving the same circumstances in one action.' Dep’t of Agric. & Consumer Servs. v. Mid-Florida Growers, Inc., 570 So.2d 892, 901 (Fla. 1990) (emphasis added). The rule does not require the joinder of a cause of action that is not 'available' because it has not accrued with a cause of action that has accrued.”

. Contra Philip Morris USA, Inc. v. Barbanell, — So.3d —, — n. 3, 2012 WL 555402 (Fla. 4th DCA 2012).

. See Notice of Judgments and Request to Take Judicial Notice and accompanying appendix, filed on September 27, 2011, and Request to Take Judicial Notice, filed on November 9, 2011, in R.J. Reynolds Tobacco Co. v. Townsend, 1D10-4585.

. See, e.g., Lukacs v. Philip Morris USA, Inc., No. 01-03822-CA 23 (Fla. 11th Cir.Ct. Nov. 14, 2008) (verdict June 11, 2002), aff'd, 34 So.3d 56 (Fla. 3d DCA 2010); Naugle v. Philip Morris USA, Inc., No. 07-036736CA (Fla. 17th Cir.Ct. Aug. 18, 2010) (verdict Nov. 19, 2009); Tate v. Philip Morris USA, Inc., No.2007-CA-021723 (Fla. 17th Cir.Ct. Aug. 6, 2010) (verdict July 8, 2010).

. See, e.g., Campbell v. R.J. Reynolds Tobacco Co., No.2008 CA 2147 (Fla. 1st Cir.Ct. Sept. 13, 2009) (verdict Aug. 19, 2009), aff'd, Liggett Group LLC v. Campbell, 60 So.3d 1078 (Fla. 1st DCA 2011) (awarding $7.8 compensatory damages to the husband, whose wife died at the age of 64); R.J. Reynolds Tobacco Co. v. Townsend, 90 So.3d 307 (Fla. 1st DCA 2012) (affirming $10.8 million compensatory damages award to estate of decedent who died at age 59, survived by his wife of 39 years).

. See, e.g., Campbell; Cohen v. R.J. Reynolds Tobacco Co., No.2007-11515 (Fla. 11th Cir.Ct. Jul. 21, 2010) (verdict Mar. 24, 2010); Gray v. RJ. Reynolds Tobacco Co., No.2007-CA-002773 (Fla. 1st Cir.Ct. Mar. 8, 2010) (verdict Feb. 5, 2010), aff'd, 63 So.3d 902 (Fla. 1st DCA), review denied, 67 So.3d 1050 (Fla.2011); Townsend.

. See, e.g., Allen v. R.J. Reynolds Tobacco Co., No. 16-2007-CA-008311 (Fla. 4th Cir.Ct. May 23, 2011) (verdict April 22, 2011, awarding $3 million to the surviving spouse and $3 million to decedent’s child).

. See, e.g., Mrozek v. Lorillard Tobacco Co., No. 16-2007-CA-011952-XXXX-MA (Fla. 4th *338 Cir. Ct.. June 8, 2011) (verdict March 2, 2011, awarding $2 million each to three children), aff'd, 60 So.3d 1057 (Fla. 1st DCA 2011); Putney v. R.J. Reynolds Tobacco Co., No.2007-CV-36668 (Fla. 17th Cir.Ct. Aug. 24, 2010) (verdict April 26, 2010, awarding $5 million each to three children).

. Compare Citrus Cnty. v. McQuillin, 840 So.2d 343, 347 (Fla. 5th DCA 2003) (concluding, "[ajfter reviewing the awards in other cases for loss of a child, parent or spouse,” that award of $4.4 million in damages for pain and suffering and loss of parental companionship, to seven-year-old child of decedent killed in car accident, "although on the outer limit in size, [wa]s not so excessive as to shock our composite judicial consciences”).

. The opinion does not reveal Marlene’s age.