# Supreme Court of Florida

_____

No. SC17-563
_____

**GWENDOLYN E. ODOM, etc.,**
Petitioner,

vs.

**R.J. REYNOLDS TOBACCO COMPANY,**
Respondent.

September 20, 2018

PARIENTE, J.

The Fourth District Court of Appeal overturned a multimillion dollar noneconomic damages award to an adult child whose mother died of lung cancer after the jury found through special interrogatories that the decedent's addiction to cigarettes was a legal cause of her death. *See R.J. Reynolds Tobacco Co. v. Odom*, 210 So. 3d 696, 698 (Fla. 4th DCA 2016). The conflict issue before us arises from the Fourth District's misapplication of the abuse of discretion standard to the trial court's denial of a motion for remittitur and creation of a bright-line cap on the amount of noneconomic damages a financially independent adult surviving child

may be awarded for the wrongful death of his or her parent.[1] Instead of properly applying the abuse of discretion standard and this Court's well-established precedent, which entitles both a jury's verdict and a trial judge's ruling on a motion for remittitur to great deference, the Fourth District relied on four district court of appeal decisions to hold that the trial court erred in denying the motion for remittitur in this case.[2] In reaching this holding, the Fourth District made the sweeping statement that "no matter" what the evidence shows, "an adult child who lives independent of the parent during the parent's smoking related illness and

---

1. We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const.; *see also Fla. Ins. Guar. Ass'n, v. Devon Neighborhood Ass'n*, 67 So. 3d 187, 189 n.1 (Fla. 2011) ("Misapplication of our precedent provides a basis for express and direct conflict jurisdiction."). Because the Fourth District's creation of a bright-line cap and then reliance on that cap to reverse the damages award in this case is both apparent from the face of the opinion (i.e., express) and irreconcilable with the contrary rule of law and abuse of discretion analysis expressly set forth in our precedent (making the conflict "direct"), we have jurisdiction. Art. V, § 3(b)(3), Fla. Const.

2. Our relevant precedent is cogently set forth in *Bould v. Touchette*, 349 So. 2d 1181, 1184-85 (Fla. 1977), *Lassitter v. International Union of Operating Engineers*, 349 So. 2d 622, 626-27 (Fla. 1976), and *Braddock v. Seaboard Air Line Railroad Co.*, 80 So. 2d 662, 668 (Fla. 1955).

In lieu of this Court's precedent, the Fourth District relied on the following district court of appeal cases to reach its decision in this case: *Philip Morris USA Inc. v. Putney*, 199 So. 3d 465 (Fla. 4th DCA 2016); *R.J. Reynolds Tobacco Co. v. Webb*, 93 So. 3d 331 (Fla. 1st DCA 2012); *MBL Life Assurance Corp. v. Suarez*, 768 So. 2d 1129 (Fla. 3d DCA 2000); *Nat'l R.R. Passenger Corp. v. Ahmed*, 653 So. 2d 1055 (Fla. 4th DCA 1995).

death is not entitled to [a] multi-million dollar compensatory damages award."
*Odom*, 210 So. 3d at 701.

For the reasons that follow, we hold that the Fourth District misapplied the abuse of discretion standard when reviewing the trial court's denial of the motion for remittitur. When the abuse of discretion standard is properly applied, we conclude that the trial court did not abuse its discretion in denying the motion by scrupulously following the standard for determining whether a remittitur is appropriate. We further hold that the Fourth District erred in creating a cap on the amount of noneconomic damages a financially independent adult child may be awarded for the wrongful death of his or her parent in conflict with this Court's precedent. Neither the Legislature nor this Court has established a cap on the amount of noneconomic damages a survivor may recover in a wrongful death action, and we decline to do so today. Accordingly, we quash the Fourth District's decision and remand for reinstatement of the judgment.[3]

---

3. The jury in this case also found that punitive damages against R.J. Reynolds were warranted. *Odom*, 210 So. 3d at 698. The punitive damages award is not separately challenged, but the effect of the Fourth District's reversal of the noneconomic damages award was also a reversal of the punitive damages award. *See id.* at 701 ("Because the award of compensatory damages must be vacated, we also vacate the award of punitive damages." (quoting *Webb*, 93 So. 3d at 339-40)). Although the liability findings would not have been disturbed, the new jury would have been entitled to hear all the evidence upon which an award of punitive damages could be based.

**FACTUAL BACKGROUND**

Petitioner Gwendolyn Odom brought this *Engle*[4] progeny action against Respondent R.J. Reynolds, alleging that her mother, Juanita Thurston, died from lung cancer caused by her addiction to cigarettes manufactured by R.J. Reynolds. *Odom*, 210 So. 3d at 698. Thurston was fifty-eight years old when she died and had never married. Odom, who was forty-two years old when Thurston died, sought noneconomic damages as Thurston's surviving daughter under Florida's wrongful death statute.[5]

The uncontroverted evidence presented at trial established "a very close and unique relationship" between Odom and Thurston that endured until Thurston's untimely death. *Odom*, 210 So. 3d at 701. Thurston was just sixteen years old when Odom was born; Odom's biological father was not in the picture. Odom and Thurston were so close that they were described as "more like sisters."

Throughout Odom's life, Thurston was a constant support to her. After leaving home and moving to South Carolina for college, Odom returned home several months later and moved back in with Thurston. Even after marrying her first husband, Odom continued to live with Thurston for a time. And when

---

4. *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246 (Fla. 2006).

5. § 768.21(3), Fla. Stat. (2014).

Odom's first marriage began to deteriorate, while she was pregnant with her first son, Odom moved back in with Thurston. Odom explained what Thurston's support during this time meant to her:

> My mother was always there for me. Without my mother, I think I would have been lost at that point. I was going through a troubled marriage, I was pregnant, and she was the one who I could count on.

Even after Odom got remarried and Odom and Thurston no longer lived together, they continued to spend a lot of time together.

In addition to providing unconditional support to Odom, Thurston was very involved with Odom's children. Thurston was present at the birth of Odom's firstborn son, Ahmad. Thurston was always there for Ahmad's football and baseball games, even traveling to different cities to watch him play. She was his biggest fan. Odom described Thurston's relationship with Ahmad as "extremely close." Thurston considered Ahmad to be her son.

Just as Thurston was there to support Odom and Odom's children, Odom was there to support Thurston. Odom was there for Thurston each time Thurston attempted to quit smoking. Odom was also there when Thurston was diagnosed with lung cancer, and supported Thurston through every step of her treatment.

Odom was also there when Thurston's cancer returned. Although Odom felt as if she had been "punched in [the] stomach" and "hit over the head with a hammer all at one time," she remained strong for Thurston. Odom explained the

pain she experienced as she witnessed Thurston's body transform from

chemotherapy:

> And [Thurston] didn't want to do anything. So it was really—it was really hard. I would go sit with my mother. She liked to lay down a lot. I would sit down with her, hold her hand. I would kiss her face. And I tried to be strong for her. I would go in the bathroom, close the door, and just cry.
>
> And I would cry in the bathroom, I would wash my face, try to get my composure, I would go back in there and, you know, try to be strong for her. I didn't want her to see how upset I was. But to see my mother like that knowing, you know, trying to remember her how she was before it happened. She was 58, but she looked like she was like 30 years older than what she was.
>
> It was—it was very—very painful for me. Very painful. And it's still painful today to think about it, what she went through, you know. She suffered a lot. A lot.

As she had always been, Odom was there when Thurston was admitted to

the hospital for the last time. As part of her typical routine, Odom went to

Thurston's house and knocked on the door. After Thurston did not answer, Odom

called several times. Finally, Thurston made it to the door. It became clear to

Odom that Thurston was having a stroke. Odom called 911 and Thurston was

taken to the hospital. At the hospital, the doctor informed Odom that Thurston was

on life support. Thurston never woke back up.

Odom described how she felt while Thurston spent her last days in the

hospital:

> It was very—it was very, very difficult for me. It was very difficult. Because at that point, I knew my mother was dying, she was pretty much dead at that point. So I just knew that this is the person that I

had always depended on my entire life, and I knew she was dying, she was gone, she was leaving—she was leaving me. And it was very, very sad.

My mother was the one person that I could always depend on. And knowing that I wasn't going to have her in my life anymore, it was going to be very, very difficult for me.

Odom further explained how she felt after her mother passed away:

I think at one point, I was depressed. I don't know that—the definition of depression, but knowing she wasn't there, I didn't want to do anything. I—it was just a bad time for me because I knew that my mother was no longer with me, and I could not call her, I couldn't see her, we couldn't talk on the phone anymore, it was just—it was very difficult.

Odom described an instance when she picked up the phone to call Thurston only to remember that Thurston was not there.

During closing arguments, Odom requested that the jury award Odom $5 million in noneconomic damages. R.J. Reynolds, on the other hand, did not suggest a number to the jury. Instead, R.J. Reynolds told the jury: "[W]e simply leave it to your good judgment and common sense as to whether Ms. Odom should be made a very wealthy person at this stage of her life . . . . We leave that question to you." On the issue of comparative negligence, R.J. Reynolds argued that the jury should find Thurston 100% at fault for her death, while Odom argued that the jury should allocate "no more than 25%" fault to Thurston. The jury awarded $6 million to Odom, which was later reduced to $4.5 million in accordance with the jury's finding that Thurston was 25% at fault. *See Odom*, 210 So. 3d at 698.

R.J. Reynolds moved for a new trial or remittitur, arguing that the jury's verdict was grossly excessive and "could only have been the result of passion and prejudice." R.J. Reynolds requested that the trial court vacate the judgment and order a new trial, "or at a minimum substantially reduce the [noneconomic] damages award to the $400,000 to $500,000 range."

After a hearing, the trial court denied R.J. Reynolds' motion. In doing so, the trial court first considered this Court's relevant precedent and the factors set forth in the remittitur statute. The trial court then observed that R.J. Reynolds' argument in favor of a remittitur was based largely upon *R.J. Reynolds Tobacco Co. v. Webb*, 93 So. 3d 331 (Fla. 1st DCA 2012), and *Philip Morris USA Inc. v. Putney*, 199 So. 3d 465 (Fla. 4th DCA 2016), "which overturned jury verdicts for surviving adult children in the amounts of $8 million and $5 million, respectively."[6] However, the trial court explicitly found that those decisions were distinguishable, explaining:

> The facts in this case were simply different [from *Webb* and *Putney*]. [Odom] and [Thurston] were only sixteen years apart and enjoyed a relationship that was described as that of close sisters, as much as a mother-daughter relationship. [Odom] lived with [Thurston], for many of the years of her adult life. Their family was close-knit and they spent considerable time together . . . . [Odom] and [Thurston] were either together every day, or spoke every day . . . .

---

6. The jury in *Putney* awarded $5 million in noneconomic damages to each of the decedent's three surviving adult children, for a total of $15 million. 199 So. 3d at 470.

Moreover, even when [Odom] no longer lived by [Thurston] . . . , this remained the case and [Thurston] was an integral part of [Odom's] family (with her own children).

These matters were not disputed; nor was the evidence of how [Thurston's] cancer and death affected [Odom]. [Odom] took her mother to nearly every treatment and medical appointment. She was deeply affected by her mother's illness as she watched her mother deteriorate and experience the ravages of systemic disease and treatment. [Odom] was by her mother's side during this time and remains affected to this day by her mother's suffering and death. Following her mother's death, [Odom] became depressed. That was a very difficult time in her life because she knew her mother was no longer there and that there were times when she would pick up the phone to call her mother, only to realize that she was gone. Even now, years after her mother's death [Odom] still misses her mother, and verbalizes her loss with her own son. Moreover, . . . there was evidence in this case that [Odom] continued to lean on her mother for support prior to her death. She had never had any relationship with her father, and her mother was all she had for support in her life.

Thus, the trial court concluded:

The Court has presided over many wrongful death cases. The Court's conscience is not shocked by the jury's [noneconomic] damage verdict, and [R.J. Reynolds] has identified nothing in the record to suggest that the verdict was the product of passion and prejudice.

Accordingly, the trial court denied the motion for remittitur and entered final judgment for Odom. *See Odom*, 210 So. 3d at 698-99.

R.J. Reynolds appealed, and the Fourth District reversed, reasoning that "[w]hen it comes to wrongful death awards, including those in the *Engle* context, courts have drawn a distinction between compensatory damages awarded to surviving spouses and to adult children." *Id.* at 699. The Fourth District explained that *Putney* and *Webb* "establish that no matter how strong the emotional bond

- 9 -

between an adult child and a decedent parent may be, an adult child who lives independent of the parent during the parent's smoking related illness and death is not entitled to multi-million dollar compensatory damages award." *Id*. at 701. The Fourth District further explained that "[c]ases from outside the tobacco arena support this conclusion." *Id*.[7]

Thus, although the evidence established that Odom and her mother "had a very close and unique relationship" and Odom "took her mother to many of her appointments and was devastated by her decline and subsequent death," the Fourth District concluded that "the relationship between an adult child living independent of their parent is simply not the type of relationship" that could justify Odom's award. *Id.* Accordingly, the Fourth District held that the trial court abused its discretion in denying R.J. Reynolds' motion for remittitur and remanded the case for the trial court to grant the motion for remittitur or order a new trial on damages. *Id.* at 703.

---

7. In *MBL Life Assurance Corp. v. Suarez*, 768 So. 2d 1129 (Fla. 3d DCA 2000), the Third District Court of Appeal reversed $1 million awards to each of the decedent's four children for the wrongful death of the decedent after a boat accident, concluding that the awards "could only have been 'a product of passions and emotions,' rather than a result of the evidence presented." *Id.* at 1136 (quoting *Harbor Ins. Co. v. Miller*, 487 So. 2d 46, 48 (Fla. 3d DCA 1986)). In *National Railroad Passenger Corp. v. Ahmed*, 653 So. 2d 1055 (Fla. 4th DCA 1995), the Fourth District affirmed awards of $400,000 to each of the decedent's seven children following a train accident, explaining that there was no indication that the jury was influenced by passion. *Id.* at 1059-60.

Odom petitioned to this Court and we granted review.

## ANALYSIS

The conflict issue in this case arises from the Fourth District's misapplication of the abuse of discretion standard to the trial court's denial of a motion for remittitur and creation of a bright-line cap on the amount of noneconomic damages a financially independent adult surviving child may be awarded for the wrongful death of his or her parent. It is well-established that a trial court's ruling on a motion for remittitur is reviewed for an abuse of discretion. *See Lassitter v. Int'l Union of Operating Eng'rs*, 349 So. 2d 622, 627 (Fla. 1976); *see also Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1263 (Fla. 2006). This Court has explained the abuse of discretion standards as follows:

> In reviewing a true discretionary act, the appellate court must fully recognize the superior vantage point of the trial judge and should apply the "reasonableness" test to determine whether the trial judge abused his discretion. If reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion. The discretionary ruling of the trial judge should be disturbed only when his decision fails to satisfy this test of reasonableness.

*Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980).

Our analysis begins by setting forth the relevant legal background. With the legal background set, we address the conflict issue presented in this case. Finally, we turn to properly review the trial court's denial of R.J. Reynolds' motion for remittitur for an abuse of discretion.

# I. Relevant Legal Background

Under Florida's wrongful death statute, "[m]inor children of the decedent, and all children of the decedent if there is no surviving spouse, may . . . recover for lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury." § 768.21(3), Fla. Stat. (2014). Thus, an adult child twenty-five years or older has a right to claim noneconomic damages under the wrongful death statute only if there is no surviving spouse. *See id.* § 768.18(2) (defining minor child as a child "under 25 years of age").

The Legislature's stated purpose with the wrongful death statute is "to shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer." *Id.* § 768.17. Prior to 1990, the wrongful death statute "only permitted minor children to recover pain and suffering damages due to the death of a parent." *Mizrahi v. N. Miami Med. Ctr., Ltd.*, 712 So. 2d 826, 828 (Fla. 3d DCA 1998), *approved*, 761 So. 2d 1040 (Fla. 2000).[8] However, in 1990, the Legislature made a policy decision that when there is no surviving spouse, surviving adult

---

8. The prior version of the statute stated that only "[m]inor children of the decedent may . . . recover for lost parental companionship, instruction, and guidance and for mental pain and suffering from the date of injury." § 768.21(3), Fla. Stat. (1987). Additionally, prior to 1979, "minor children" included only "dependent unmarried children under 21 years of age, notwithstanding the age of majority." § 768.18(2), Fla. Stat. (1979). The definition of "minor children" was changed in 1981 to include all children under the age of twenty-five, notwithstanding the age of majority. § 768.18(2), Fla. Stat. (1981).

children are entitled to recover noneconomic damages for the wrongful death of their parent. There is no statutory requirement that the adult child or children be financially dependent on the decedent at the time of the decedent's death in order to make a claim for noneconomic damages under the statute. *See* § 768.21(3), Fla. Stat. (2014).

In tandem with the right to recover noneconomic damages, in every case for money damages the trial court has a separate obligation to determine if the damages award is "excessive or inadequate in light of the facts and circumstances which were presented to the trier of fact." *Id.* § 768.74(1). The remittitur statute explains that although "the reasonable actions of a jury are a fundamental precept of American jurisprudence and . . . such actions should be disturbed or modified with caution and discretion," requiring courts to review the damages awarded by juries "provides an additional element of soundness and logic to our judicial system and is in the best interests of the citizens of this state." *Id.* § 768.74(6). Thus, when a court "finds that the amount awarded is excessive . . . it shall order a remittitur." *Id.* § 768.74(2).

The remittitur statute provides a list of factors for courts to consider when determining whether an award is excessive or inadequate:

> (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;

(b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;

(c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;

(d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and

(e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

*Id.* § 768.74(5).

In addition to the factors set forth in the remittitur statute, this Court has observed that reviewing "amounts awarded in similar cases has at least a limited value" in determining whether an award is excessive. *Loftin v. Wilson*, 67 So. 2d 185, 189 (Fla. 1953). This observation came with a caution, however, that comparisons are "sometimes fraught with danger because, of course, each case is different and must of necessity be measured in the light of the circumstances peculiar to it." *Id.*; *see also Laskey v. Smith*, 239 So. 2d 13, 14 (Fla. 1970) ("In its movement toward constancy of principle, the law must permit a reasonable latitude for inconstancy of result in the performance of juries.").

Notwithstanding the factors set forth in the remittitur statute and any guidance that can be gleaned from reviewing similar cases, this Court has recognized that measuring noneconomic damages is inherently difficult as "there is no objective standard by which to measure" them. *Angrand v. Key*, 657 So. 2d

1146, 1149 (Fla. 1995). "Technical or mathematical calculations are impossible to make." *Id.* Because of the inherent difficulty in measuring these kinds of damages, this Court has determined that "[t]he jury, guided by its judgment and everyday life experiences, is in the best position to make a fair assessment of these damages." *Id.* As we have explained:

> Jurors know the nature of pain, embarrassment and inconvenience, and they also know the nature of money. Their problem of equating the two to afford reasonable and just compensation calls for a high order of human judgment, and the law has provided no better yardstick for their guidance than their enlightened conscience. Their problem is not one of mathematical calculation but involves an exercise of their sound judgment of what is fair and right.

*Braddock v. Seaboard Air Line R.R. Co.*, 80 So. 2d 662, 668 (Fla. 1955).

In addition, the standard jury instructions, which were given in this case, explain to the jury that "there is no exact standard for fixing the compensation" of a noneconomic damages award. Fla. Std. Jury Instr. (Civ.) 502.2. The jury is further cautioned not to allow sympathy or prejudice influence their decision. Fla. Std. Jury Instr. (Civ.) 700.

Because assessing the amount of damages is within the province of the jury, this Court has made clear that when reviewing a motion for remittitur, a court "should never declare a verdict excessive merely because it is above the amount which the court itself considers the jury should have allowed." *Bould v. Touchette*, 349 So. 2d 1181, 1184 (Fla. 1977). And when a trial judge refuses to grant a

- 15 -

remittitur, "[t]he correctness of the jury's verdict is strengthened." *Lassitter*, 349

So. 2d at 627. As this Court explained in *Lassitter*:

> Two factors unite to favor a very restricted review of an order denying a motion for new trial on ground of excessive verdict. The first of these is the *deference due the trial judge, who has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record*. The second factor is the deference properly given to the jury's determination of such matters of fact as the weight of the evidence and the quantum of damages.
> The appellate court should not disturb a verdict as excessive, where the trial court refused to disturb the amount, unless the verdict is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.

*Id.* (emphasis added). Stated another way, an appellate court should only hold an

award excessive if it "shock[s] the judicial conscience." *Seaboard Coast Line R.R.*

*Co. v. McKelvey*, 270 So. 2d 705, 706 (Fla. 1972). In order to shock the judicial

conscience, "the verdict must be so excessive or so inadequate so as at least to

imply an inference that the verdict evinces or carries an implication of passion or

prejudice, corruption, partiality, improper influences, or the like." *Lassitter*, 349

So. 2d at 627.

We have not yet addressed whether a noneconomic damages award in an

*Engle* progeny case was so excessive that it shocked the judicial conscience and

thus necessitated a remittitur. However, we recently held that a punitive damages

award of $30 million in an *Engle* progeny case did not shock the conscience

- 16 -

merely because it was more than what the plaintiff requested. *See, e.g.*, *Schoeff v. R.J. Reynolds Tobacco Co.*, 232 So. 3d 294, 308 (Fla. 2017).

In *Schoeff*, the plaintiff "asked the jury not to exceed $25 million in punitive damages." *Id.* Because the jury awarded $30 million, the Fourth District concluded that the award could not have been "adduced in a logical manner by reasonable persons." *Id.* (quoting § 768.74(5)(e), Fla. Stat. (2012)). This Court rejected that conclusion, explaining that "this single factor is insufficient to render an award excessive. The fact that the jury exceeded requested damages does not render the award itself unreasonable or excessive." *Id.*

Having set forth the relevant legal background, we now turn to explain how the Fourth District misapplied the well-established abuse of discretion standard when reviewing the trial court's denial of R.J. Reynolds' motion for remittitur.

**II. Misapplication of the Abuse of Discretion Standard**

First, it is clear that the Fourth District misapplied the abuse of discretion standard, as it paid no deference to the trial court, which "had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record." *Lassitter*, 349 So. 2d at 627. In fact, the Fourth District's decision fails to discuss or otherwise mention the trial court's well-reasoned order denying R.J. Reynolds' motion. Determining that the trial court abused its discretion without first determining that the trial court's decision was

- 17 -

unreasonable is not consistent with the abuse of discretion standard. *See Canakaris*, 382 So. 2d at 1203 (explaining that the abuse of discretion standard is a test of reasonableness).

Second, in addition to the lack of deference to the decision of the trial court, the Fourth District failed to consider any of the factors set forth in the remittitur statute. *See* § 768.74(5)(a)-(e), Fla. Stat. (2014). While the Fourth District's opinion recites the factors, it does not identify the presence of any of the factors in this case, including that the jury's award was indicative of passion. *Id.* As this Court has explained, an award is only excessive if it "evinces or carries an implication of passion or prejudice, corruption, partiality, improper influences, or the like." *Lassitter*, 349 So. 2d at 627. Not only did the Fourth District not identify the presence of passion in the jury's verdict, but it failed to acknowledge that the trial court, after careful consideration of the factors in the remittitur statute, explicitly concluded that the jury's award was *not* indicative of "passion, prejudice, corruption or other improper motive." *Bould*, 349 So. 2d at 1184.

Third, and significantly, the Fourth District misapplied the abuse of discretion standard when it concluded that the jury's verdict in this case was excessive based on four district court of appeal decisions, two of which the trial court expressly found to be distinguishable. *See Odom*, 210 So. 3d at 701. Although we have stated that reviewing awards in similar cases can be helpful in

determining whether a particular award is excessive, we also stated, in the very same case, that "each case is different and must of necessity be measured in the light of the circumstances peculiar to it." *Loftin*, 67 So. 2d at 189. Here, consistent with our precedent, the trial court appropriately considered the cases cited by R.J. Reynolds, *Webb* and *Putney*, when reviewing whether the jury's verdict was excessive. After careful consideration, the trial court determined that the facts of this case "were simply different."

In reversing the trial court, the Fourth District did not conclude that this determination by the trial court was unreasonable. Rather, instead of assessing the reasonableness of the trial court's determination, as required by the abuse of discretion standard, the Fourth District concluded that two other district court of appeal cases "establish that no matter" what the evidence showed, the jury's multimillion dollar verdict in this case was excessive because it was in favor of a financially independent adult child. *Odom*, 210 So. 3d at 701. The Fourth District's total reliance on district court of appeal cases to the exclusion of this Court's precedent, as well as the particular circumstances of the case before it, is simply not the kind of deferential review that the abuse of discretion standard requires.

For the reasons stated, we conclude that the Fourth District erred by misapplying the abuse of discretion standard when reviewing the trial court's

denial of R.J. Reynolds' motion for remittitur. We now turn to address the Fourth District's cap on damages.

### III. Cap on Damages

In addition to misapplying the abuse of discretion standard, the Fourth District created a cap on the amount of noneconomic damages a financially independent adult child may be awarded for the wrongful death of his or her parent when it concluded that, regardless of the evidence, "the relationship between an adult child living independent of their parent is simply not the type of relationship" that can justify a multimillion noneconomic damages award. *Id*. Because the Fourth District's cap on damages does not find support in either Florida Statutes or this Court's precedent, we conclude that this was error.

In creating this cap on damages, the Fourth District relied on *Webb* and *Putney*, which it concluded "establish that no matter how strong the emotional bond between an adult child and a decedent parent may be, an adult child who lives independent of the parent during the parent's smoking related illness and death is not entitled to multi-million dollar compensatory damages award." *Id*. However, neither *Webb* nor *Putney* actually support the Fourth District's creation of a cap. In *Webb*, although the First District reviewed awards in similar cases, it ultimately determined that the verdict in that case was the product of passion. 93 So. 3d at 338-39. Likewise, in *Putney*, the Fourth District concluded that the

award was excessive because "there was not evidence of the type of close or supportive relationship that would justify such an award." 199 So. 3d at 471. We do not read either of these cases as creating or suggesting a bright-line cap on noneconomic damages for financially independent adult children.

Even if we were to conclude that *Webb* and *Putney* support the Fourth District's creation of a cap, neither the Legislature nor this Court has limited or established a bright-line cap on the amount a survivor may be awarded in noneconomic damages under the wrongful death statute. To the contrary, the Legislature has expressly permitted all adult children of a decedent to recover noneconomic damages for the decedent's wrongful death "if there is no surviving spouse." § 768.21(3), Fla. Stat. (2014). In doing so, the Legislature did not impose a cap on the amount an adult child may recover, nor did it include a requirement that the child be financially dependent on the decedent at the time of the decedent's death. *See id.*

Thus, the sole requirement for an adult child to recover noneconomic damages for the wrongful death of his or her parent is that the parent must not be survived by a spouse. Additionally, while the Legislature has bestowed upon courts the responsibility of reviewing awards for money damages and remitting awards that are excessive, notably absent from the list of factors in the remittitur statute for courts to consider when determining whether an award is excessive is

the "type of relationship" between the decedent and survivor. *Odom*, 210 So. 3d at 701; *see* § 768.74(2), Fla. Stat. (2014).

This Court also has not capped the amount that may be awarded, and we decline to impose such a cap today. Instead, we reaffirm that a verdict should only be held excessive, and thus remitted, where it "evinces or carries an implication of passion or prejudice, corruption, partiality, improper influences, or the like." *Lassitter*, 349 So. 2d at 627. Additionally, while verdicts in other similar cases may be instructive, those cases are not dispositive in determining whether a specific verdict is excessive. Finally, and importantly, courts must resist the urge to "declare a verdict excessive merely because it is above the amount which the court itself considers the jury should have allowed." *Bould*, 349 So. 2d at 1184. Both the Legislature and this Court have aptly recognized that the determination of the appropriate amount of damages is best left to the enlightened conscience of jurors, who know "what is fair and right." *Braddock*, 80 So. 2d at 668.

Having concluded that the Fourth District misapplied the abuse of discretion standard and erroneously capped the amount of damages a financially independent adult child may be awarded for the wrongful death of his or her parent, we now turn to properly apply the abuse of discretion standard to the trial court's denial of R.J. Reynolds' motion for remittitur in this case.

## IV. This Case

In this case, the jury was presented with extensive and undisputed evidence of the "very close and unique relationship" that Odom and Thurston shared and the effect Thurston's years-long suffering and eventual death had on Odom. *Odom*, 210 So. 3d at 701. This evidence established that there was not only a loss of parental companionship, instruction, and guidance, but also mental pain and suffering from the date Thurston was originally diagnosed until her death approximately three years later, during which time Odom supported Thurston every step of the way. The jury also heard evidence that, at age fifty-eight, Thurston had a life expectancy of an additional 24.5 years.

While Odom advocated for an award of $5 million, R.J. Reynolds chose not to suggest a specific amount or even a range to the jury. Instead, R.J. Reynolds left the question of how much to award to the "good judgment and common sense" of the jury, asking only whether they wanted to make Odom a "very wealthy person at this stage of her life." Only after the jury returned its verdict did R.J. Reynolds argue that an award in "the $400,000 to $500,000 range" was appropriate. It is difficult for a party to challenge an award as excessive after the fact when that party declined to offer any guidance to the jury at trial. *See Hawk v. Seaboard Sys. R.R., Inc.*, 547 So. 2d 669, 674 (Fla. 2d DCA 1989) (Altenbernd, J., concurring) ("When the defendant does not assist the jury in establishing a range for a verdict,

it is more difficult for the defendant to later suggest that a verdict below the plaintiffs' request is somehow a verdict which exceeds the maximum limit of the reasonable range in which the jury was free to operate.").

When ruling on R.J. Reynolds' motion for remittitur, the trial court properly identified the standard for determining if an award is excessive and considered the factors set forth in the remittitur statute. Noting that R.J. Reynolds' argument was based on *Webb* and *Putney*, the trial court carefully compared the facts of those cases with this case and determined that they were "simply different." In making this determination, the trial court detailed the undisputed evidence of Odom and Thurston's relationship and how Thurston's cancer and death affected Odom. Concluding that its conscience was "not shocked by the jury's compensatory damage verdict and [R.J. Reynolds] ha[d] identified nothing in the record to suggest that the verdict was the product of passion and prejudice," the trial court denied the remittitur. We conclude that the trial court did not abuse its discretion in denying the motion for remittitur.

Further, we reject the Fourth District's conclusion that the relationship between Odom, a financially independent adult child, and her deceased mother is "not the type of relationship" that can justify a multimillion dollar noneconomic damages award. *Odom*, 210 So. 3d at 701. This Court's precedent clearly allows

for a multimillion dollar noneconomic damages award where, as here, the award is supported by the evidence, and is not indicative of passion or prejudice.

**CONCLUSION**

Because the trial court did not abuse its discretion in denying R.J. Reynolds' motion for remittitur, we quash the decision of the Fourth District and remand with instructions to reinstate the final judgment. We also disapprove *Webb* and *Putney* to the extent they are inconsistent with this opinion. Finally, we award Odom attorney's fees for the appeal of this case in an amount to be determined by the trial court because the judgment in this case far exceeds the proposal for settlement filed by Odom, pursuant to section 768.79(1), Florida Statutes (2014), in the amount of $100,000.[9]

It is so ordered.

LEWIS, QUINCE, LABARGA, and LAWSON, JJ., concur.
POLSTON, J., dissents with an opinion, in which CANADY, C.J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

POLSTON, J., dissenting.

---

9. Although the trial court would normally determine entitlement to fees based on a proposal for settlement on remand, *see* § 768.79(6), Florida Statutes (2014), the record reflects that the trial court has already entered an agreed order finding that Odom is entitled to attorney's fees under the statute.

Because the Fourth District's decision in *R.J. Reynolds Tobacco Co. v. Odom*, 210 So. 3d 696 (Fla. 4th DCA 2016), does not expressly and directly conflict with any of the decisions cited by Odom in her petition for jurisdiction, this Court does not have the constitutional authority to overturn the Fourth District's decision. The majority improperly asserts conflict jurisdiction based on a "misapplication of the abuse of discretion standard." This case was decided on its own set of facts not present in the other decisions. Therefore, I respectfully dissent.

First, Odom does not conflict with *Lassitter v. International Union of Operating Engineers*, 349 So. 2d 622 (Fla. 1976). Lassitter brought an action against a fellow union member, the local union, and international unions for "injuries sustained in union violence" and was awarded $240,000 in compensatory damages and cumulatively upwards of $1 million in punitive damages. *Id.* at 623. In *Lassitter*, this Court held that Florida courts are not to require punitive damages to bear some reasonable relationship to compensatory or actual damages. *Id.* at 626. Nothing in the Fourth District's decision in *Odom* conflicts with this Court's holding in *Lassitter* that punitive damages need not bear some reasonable relationship to compensatory or actual damages.

However, in *Lassitter*, this Court also explained that an appellate court may review a trial court's ruling in denying a motion for a new trial or remittitur only

for an abuse of discretion. *Id.* at 627. This Court in *Lassitter* stated that "[t]he appellate court should not disturb a verdict as excessive, where the trial court refused to disturb the amount, unless the verdict is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Id.* But contrary to the majority's assertion otherwise, the Fourth District in *Odom* did not "misapply the abuse of discretion standard" outlined in *Lassitter* when it examined the jury award in *Odom* and compared it to awards in similar cases. Instead, the Fourth District in *Odom* was applying the *Lassitter* test of reviewing the trial court's ruling of the reasonableness of the award for an abuse of discretion. *Odom*, 201 So. 3d at 701 ("Accordingly, we hold that the trial court abused its discretion when it denied RJR's motion for remittitur or a new trial."). The Fourth District simply concluded that the trial court abused its discretion in permitting an award of compensatory damages outside the reasonable range as exemplified by similar cases. *Id.* at 699, 701 (explaining that "a compensatory damage award is only excessive if it is so large that it exceeds the maximum limit of a reasonable range" and concluding, "[b]ased on the foregoing precedent, the jury's award of $6 million in compensatory damages to Plaintiff for the loss of her mother was excessive"). Therefore, *Odom* and *Lassitter* do not conflict.

Second, *Odom* does not conflict with *Braddock v. Seaboard Air Line Railroad Co.*, 80 So. 2d 662 (Fla. 1955). In *Braddock*, 80 So. 2d at 663-64, a minor child and his father brought personal injury claims against a railroad after the eight-year-old was struck by a locomotive and lost his left leg. This Court held that an award for future pain and suffering should not be reduced to present value. *Id.* at 668. This Court in *Braddock,* 80 So. 2d at 668, explained that jurors use their "enlightened conscience" when determining damages for pain and suffering, not mathematical calculations. However, the Fourth District in *Odom*, 210 So. 3d at 701, did not examine whether the compensatory damages should be reduced to the present value, only whether the trial court abused its discretion in its ruling regarding whether the compensatory damages at issue exceeded a reasonable range. Therefore, the two cases do not conflict. The lack of conflict is particularly glaring given this Court's express statement in *Braddock*, 80 So. 2d at 668, that "the question of the excessiveness of the verdicts is neither decided nor precluded by this appeal."

Third, *Odom* does not conflict with *Bould v. Touchette*, 349 So. 2d 1181 (Fla. 1977). *Bould* involved an elderly woman who brought a wrongful death action after the deaths of her daughter and son-in-law in a car accident. *Id.* at 1183-84. This Court applied the *Lassitter* test and concluded that a jury award of $100,000 for compensatory damages "was not so inordinately large as obviously to

- 28 -

exceed the maximum limit of a reasonable range within which the jury may properly operate." *Id.* at 1186. In addition to the difference between the amounts of the compensatory damages involved in the two cases, *Bould* is factually distinct from *Odom* in that Bould was an unemployed, elderly woman who had been supported by her daughter and son-in-law for over 30 years at the time of their deaths. *Id.* at 1185. This Court explained that, "[a]s a result of the death[s], Bould was forced to move into a nursing home in Buffalo, New York, and at the time of trial had lost three years of support." *Id.* In contrast, Odom was an independent adult child with a family of her own. *Odom*, 210 So. 3d at 701. Therefore, because Bould was dependent upon the decedents and Odom was not financially dependent upon her deceased mother, the cases are factually distinct and do not conflict.

Lastly, the majority claims that this Court has conflict jurisdiction because of the Fourth District's "creation of a bright-line cap on the amount of noneconomic damages a financially independent adult surviving child may be awarded for the wrongful death of a parent." Majority op. at 1-2. However, as just outlined above, the three decisions alleged to be in conflict by the Petitioner did not involve an award to a financially independent adult surviving child, let alone address whether a cap on noneconomic damages for such individuals is permissible. Moreover, contrary to the majority's claim otherwise, no bright-line

cap was announced by the Fourth District's holding. Rather, the Fourth District considered other cases, and the facts in this case, to determine that Odom's relationship did not justify the amount of the award in this case and was outside the range or reasonableness:

> Based on the foregoing precedent, the jury's award of $6 million in compensatory damages to Plaintiff for the loss of her mother was excessive. Although the evidence established that Plaintiff and her mother had a very close and unique relationship, at the time of Ms. Thurston's illness and death, Plaintiff was not living with Ms. Thurston and was not financially or otherwise dependent on her. Instead, Plaintiff was married with two children of her own and Ms. Thurston was living with her long-time partner. Although Plaintiff took her mother to many of her appointments and was devastated by her decline and subsequent death, the relationship between an adult child living independent of their parent is simply not the type of relationship which can justify the magnitude of the Plaintiff's compensatory damage award. Accordingly, we hold that the trial court abused its discretion when it denied RJR's motion for remittitur or a new trial.

*Odom*, 210 So. 3d at 701.

Accordingly, because *Odom* does not expressly and directly conflict on the same question of law with any of the decisions cited by the Petitioner, this Court does not have jurisdiction to review this case. I respectfully dissent.

CANADY, C.J., concurs.

Application for Review of the Decision of the District Court of Appeal – Direct Conflict of Decisions

Fourth District - Case No. 4D14-3867

(Palm Beach County)

Rosalyn Sia Baker-Barnes, Mariano Garcia, and T. Hardee Bass of Searcy Denney Scarola Barnhart & Shipley, P.A., West Palm Beach, Florida; and Daniel R. Hoffman and David J. Sales of David J. Sales, P.A., Jupiter, Florida,

for Petitioner

William L. Durham II and Val Leppert of King & Spalding LLP, Atlanta, Georgia; Jeffrey S. Bucholtz of King & Spalding LLP, Washington, D.C.; and Jeffrey A. Cohen of Carlton Fields Jorden Burt, P.A., Miami, Florida,

for Respondent

John S. Mills and Courtney Brewer of The Mills Firm, P.A., Tallahassee, Florida,

for Amicus Curiae Florida Justice Association

Kansas R. Gooden of Boyd & Jenerette, PA, Jacksonville, Florida; and Elaine D. Walter of Gaebe Mullen Antonelli & DiMatteo, Coral Gables, Florida,

for Amicus Curiae Florida Defense Lawyers Association

William W. Large of Florida Justice Reform Institute, Tallahassee, Florida; and Jason Gonzalez and Amber Stoner of Shutts & Bowen LLP, Tallahassee, Florida,

for Amicus Curiae Florida Justice Reform Institute