[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-13954

_____

AM GRAND COURT LAKES LLC,
AM 280 SIERRA DRIVE LLC,

Plaintiffs-Counter Defendants-Appellees,

*versus*

ROCKHILL INSURANCE COMPANY,

Defendant-Counter Claimant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:18-cv-23576-KMW

_____

Before JILL PRYOR, NEWSOM, and GRANT, Circuit Judges.

JILL PRYOR, Circuit Judge:

AM Grand Court Lakes LLC and AM 280 Sierra Drive LLC (collectively "AM Grand") owned a group of buildings that were operated as an assisted living facility. AM Grand submitted a claim to its insurer, Rockhill Insurance Company, for damage caused by Hurricane Irma. Rockhill denied the claim because it determined that the hurricane caused only minor damage to the property and the cost of any repairs was less than the insurance policy's deductible.

AM Grand sued Rockhill for breach of the policy. The case went to trial, where a jury found that Rockhill had breached the terms of the insurance policy and that AM Grand's covered losses amounted to $9,280,000. Based on the jury's findings, the district court entered judgment in AM Grand's favor. After the district court entered judgment, Rockhill filed a motion for a new trial arguing that the jury's damages award was excessive. The district court denied the motion.

Rockhill argues on appeal that the district court erred in denying its motion for a new trial because there was no evidence in the record to support the jury's finding that AM Grand sustained a loss of $9,280,000. After careful consideration, and with the benefit of oral argument, we conclude that the evidence was sufficient to sustain the verdict. Thus, we affirm.

## I.

## A.

AM Grand owned property in Miami Gardens, Florida, which it operated as an assisted living facility. The facility comprised five buildings, each of which was five stories tall. The buildings were connected by a series of catwalks. There were about 200 residential units at the facility. The facility also included a dining room, an activity center, and nursing stations. All together, the facility totaled approximately 165,000 square feet.

AM Grand insured the property against certain losses, including losses due to hurricanes. Under the insurance policy's terms, Rockhill was required to "pay for direct physical loss of or damage to" the property. Doc. 203-2 at 30.[1] The maximum coverage under the policy was $15,112,500. For claims arising out of damage caused by a hurricane, the policy had a deductible of $330,250, which represented two percent of the total insured value.

On September 10, 2017, Hurricane Irma made landfall. In the area near the facility, the storm produced heavy rain and wind gusts of over 100 miles per hour. According to Jonathan Kirschner, who was responsible for overseeing the property for AM Grand, the five buildings were in good condition before the hurricane. Although parts of some of the buildings previously had sustained

---

[1] "Doc." numbers refer to the district court's docket entries.

water damage, Kirschner reported that AM Grand had repaired this damage before the hurricane.

After the storm, Kirschner visited the property and saw that it had suffered substantial damage. He observed that portions of the roofs on two of the buildings (Buildings B and D) "had been pulled up" in the storm and were missing. Doc. 270-3 at 25–26. To keep additional water from permeating these buildings due to the roof damage, AM Grand hired a contractor who performed temporary repairs to the roof of Building D and potentially also Building B.[2]

AM Grand notified Rockhill that the property had sustained damage in Hurricane Irma and submitted a claim for the damage. AM Grand hired a public insurance adjuster, Five Star Claims Adjusting, to assist with its claim. After inspecting the property, Five Star concluded that the roofs of all five buildings had been damaged in the hurricane and needed to be replaced. It estimated a cost of approximately $1,200,000 to replace all the roofs. Because AM Grand could not afford to replace the roofs, it waited for Rockhill to approve its claim.

Rockhill hired an independent adjusting firm, Engle Martin, to review AM Grand's claim. Colby Chavers, an Engle Martin

---

[2] There is conflicting evidence in the record about whether temporary repairs were made to the roof of Building B. Several witnesses testified at trial that temporary repairs were made to the roof of Building D only. But at least one witness reported that temporary repairs were made to the roof of Building B as well.

employee, was assigned the claim. Chavers's role was to determine the extent of the damage caused by the hurricane and estimate how much it would cost to repair the damage. Shortly after the storm, he visited the property and conducted a physical inspection. From his inspection, Chavers determined that the only damage from the storm was to a portion of the roof of Building D. When he inspected the buildings, Chavers saw some evidence of water damage inside the buildings. But he concluded that this water damage had occurred over time before Hurricane Irma.

In addition, Rockhill hired third-party experts to evaluate the scope of the damage caused by the hurricane.[3] Engle Martin engaged Timothy Philmon from Donan Engineering and Mason Mitchell from the Tines Group. About three months after the hurricane, Philmon and Mitchell inspected the property, including the roofs and some interior areas of the buildings.

After this physical inspection, Philmon determined that the damage from Hurricane Irma was confined to Building D and that only a portion of Building D's roof needed to be repaired. Philmon found "no interior or structural damage" to Building D from the hurricane. Doc. 270-3 at 162. Philmon admitted that he saw "severe deterioration" of parts of Building B's roof, *id.* at 180, but he concluded that this deterioration was the result of regular "wear and tear" that occurred before Hurricane Irma. Doc. 270-4 at 34–35.

---

[3] AM Grand does not dispute that the policy permitted Rockhill to retain these additional experts.

Mitchell prepared an estimate of the cost of these repairs. He estimated that it would cost approximately $149,000 to repair the portions of Building D's roof that Philmon determined had been damaged in the hurricane.[4]

Based on this estimate and the cost of the temporary repairs that AM Grand had already completed for Building D, Rockhill determined that AM Grand sustained a loss of $235,556.80 due to the hurricane. Because this amount was less than the policy's hurricane deductible, Rockhill concluded that it owed nothing under the policy. In May 2018, approximately eight months after the hurricane, Rockhill notified AM Grand of its decision.

AM Grand maintains that while it was awaiting Rockhill's decision, the condition of the buildings deteriorated. According to Kirschner, moisture damage began to appear inside the buildings. AM Grand's maintenance department tried to make repairs. But the moisture damage kept recurring, requiring additional repairs. As a result, the maintenance department had to repair some of the buildings' interior walls multiple times.

After Rockhill denied the claim, with the buildings' conditions worsening, AM Grand hired Sergio Arce, an independent insurance adjuster, to assess the scope of damage the property

---

[4] Because AM Grand's public adjuster had determined that all the roofs needed to be replaced, Engle Martin prepared its own estimate about the cost to replace all the roofs. It estimated that replacing all the roofs would cost $1,110,714.

sustained from the hurricane. In July 2018, approximately 10 months after the hurricane, Arce inspected the property and performed diagnostic testing on the roofs and interior walls of each building. Based on his inspection, Arce determined that the roofs of all five buildings suffered "catastrophic failure due to Hurricane Irma" and needed to be replaced. Doc. 203-59 at 5.

Arce also determined that water had permeated the walls of the buildings due to the roof damage. He took readings of the moisture levels on the floors, ceilings, and walls and found high moisture levels throughout the buildings. He saw "a lot of water staining, spalling, [and] blistering of walls particularly around the columns in the hallways of all the buildings." Doc. 270-2 at 30.

Al Brizuela, a structural engineer and building contractor, worked alongside Arce. Brizuela agreed with Arce's opinions that the roofs of all the buildings were damaged and that the moisture permeated the interior walls of the buildings. Brizuela concluded that this damage resulted from Hurricane Irma.

Brizuela explained how the damage to the buildings' roofs caused the moisture problems in the walls. He said that the roof of each building was saturated with water. The water then migrated down the walls of each building. He explained that the concrete walls were constructed with hollow core planks. Water was trapped and accumulated in these hollow areas. The water then corroded the rebar in the walls, which led to expansion and cracking of the concrete walls in every building.

Brizuela assessed what was needed to repair this damage to the buildings' interiors. To repair the damage to the concrete walls, he opined, contractors would have to open up the damaged areas and remove the water from the hollow areas. They would then have to chip away the damaged concrete, brush the rebar to remove the rust, and cover the rebar with rust inhibitor. Lastly, they would need to apply concrete patches. According to Brizuela, it would be less expensive to knock down and rebuild the buildings than to try to repair the concrete because the labor costs associated with the repairs would be "astronomical." *Id.* at 99.

AM Grand relied on Alain Gonzalez, a construction manager with experience constructing assisted living facilities, to estimate the cost of rebuilding. According to Gonzalez, it would generally cost between $315 and $400 per square foot to build an assisted living facility. But Gonzalez had never seen a successful bid of less than $200 per square foot. Given Gonzalez's estimates of the cost per square foot to rebuild and that the existing buildings covered approximately 165,000 square feet, it would cost AM Grand between $33,000,000 and $66,000,000 to rebuild all the buildings.

**B.**

After Rockhill failed to pay the claim, AM Grand sued the insurer in Florida state court for breach of contract. Rockhill removed the action to federal district court and filed a counterclaim seeking a declaratory judgment that it owed AM Grand nothing under the policy.

The district court held a jury trial, which lasted five days. At trial, the jury heard testimony from witnesses including Kirschner, Chavers, Philmon, Mitchell, Arce, Brizuela, and Gonzalez.

The primary dispute at trial was the extent to which the property sustained damage from Hurricane Irma. AM Grand contended that the storm damaged the roofs and interiors of each of the five buildings. Based on Brizuela's opinion that it would be less expensive to rebuild rather than repair the buildings and Gonzalez's opinion about the cost of rebuilding, AM Grand asked the jury to award $15,112,500, an amount equal to the policy limits. If the jury concluded that only the roofs were damaged by the storm, however, AM Grand asked alternatively for the jury to find that it sustained a loss of approximately $1,200,000, representing the cost to replace all the roofs based on the estimate from Five Star, its public adjuster.[5]

In contrast, Rockhill took the position that the property sustained minimal damage from Hurricane Irma. It maintained that only a portion of the roof of one building, Building D, was damaged by the hurricane. It presented evidence showing that the loss AM Grand sustained for this damage was $235,556.80, which was less than the policy's deductible. Rockhill offered no evidence about the cost to repair or rebuild if the hurricane damaged the interior of any of the buildings.

---

[5] Although the public adjuster from Five Star did not testify at trial, Five Star's estimate was admitted into evidence.

The jury found that Rockhill breached the insurance policy. It determined that AM Grand's "covered damages resulting from Hurricane Irma" were $9,280,000. Doc. 202 at 1–2. After subtracting for the policy's deductible and making other adjustments, the district court entered a judgment in AM Grand's favor in the amount of $8,753,594.61 plus pre-judgment and post-judgment interest.[6]

Rockhill filed a motion for a new trial.[7] It argued that the jury's finding that AM Grand sustained damages in the amount of $9,280,000 was "excessive." Doc. 252 at 18. Because there was "no reasonable relation" between the "amount of damages sought" and the amount of the jury's award, Rockhill argued, the jury's award must have been based on "speculation and conjecture." *Id.* at 20.

_____

[6] AM Grand also has sought to recover its attorney's fees and costs. After the disposition of this appeal, the district court will rule on AM Grand's request.

[7] Rockhill also filed a motion for judgment as matter of law, arguing, consistent with its strategy at trial, that there was no evidence that AM Grand sustained a loss "in excess of the [p]olicy's deductible," and therefore the record did not support any amount of damages. Doc. 186 at 4. The district court denied the motion.

On appeal, Rockhill argues that the district court erred in denying its motion for judgment as a matter of law. But Rockhill conceded in its reply brief that based on the estimated $1,200,000 to replace all the roofs, the evidence supported a jury finding that AM Grand sustained a loss up to that amount. We agree with Rockhill's concession that this evidence was sufficient to allow the jury to award AM Grand *some* damages. The district court thus did not err in denying Rockhill's motion for judgment as a matter of law.

The district court denied the motion. Addressing Rockhill's argument that the damages award was excessive, the court explained that the relevant question was whether the jury's award was "so inordinately large" that it "obviously . . . exceed[ed] the maximum limit of a reasonable range." Doc. 279 at 19 (internal quotation marks omitted). The court concluded that Rockhill failed to show the verdict was excessive. The court observed that at trial each party made a strategic decision to take an all-or-nothing approach to the case. First "all": AM Grand sought the policy limits of $15,112,500, maintaining that Hurricane Irma had damaged the roofs and interior of all five buildings and the buildings needed to be rebuilt rather than repaired. Then "nothing": Rockhill urged that AM Grand could recover nothing because the hurricane had damaged only a portion of one building's roof, and it would cost less than the policy's deductible to repair this damage. The court concluded that the jury "rejected both sides' ultimate positions" when it found that AM Grand suffered damage from the hurricane in an amount above the deductible but below the policy limits. *Id.* at 21. Because the jury's verdict was "within the range shown by the evidence at trial," the court ruled that the verdict was not excessive. *Id.* at 21 n.12 (internal quotation marks omitted).[8]

---

[8] Rockhill also filed a motion for relief from the judgment under Rule 60. In the Rule 60 motion, it argued, in relevant part, that the verdict should be set aside because the jury's award was excessive. The court denied the Rule 60 motion explaining that it had "already determined," in denying the motion for a new trial, "that there [was] evidence on the record sufficient" to support the award. Doc. 279 at 24.

This is Rockhill's appeal.

## II.

We review for abuse of discretion a district court's denial of a motion for a new trial. *See Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1204 (11th Cir. 2020). In reviewing a compensatory damages award on a state-law claim, we evaluate the propriety of the award under state law. *See Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1211 (11th Cir. 2010); *see Kerrivan*, 953 F.3d at 1204 n.6 (looking to state law to determine whether a compensatory damages award was excessive).

## III.

The issue before us on appeal is whether the district court abused its discretion when it denied Rockhill's motion for a new trial. Rockhill argues that the district court should have ordered a new trial because the damages the jury awarded were excessive.

Under Florida law,[9] it is the responsibility of "the court, upon proper motion, to review the amount of" a damages award to determine whether the amount is "excessive . . . in light of the facts and circumstances which were presented to the trier of fact."

---

[9] Here, there is no dispute that Florida supplies the relevant state law.

20-13954                Opinion of the Court                13

Fla. Stat. § 768.74(1).[10] To determine whether an award is excessive, the court must consider the following criteria:

> (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
>
> (b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
>
> (c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;
>
> (d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and
>
> (e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

*Id.* § 768.74(5).

When reviewing a jury's damages award under § 786.74, we must bear in mind that "assessing the amount of damages is within

---

[10] Florida law requires a court to review whether a damages award is excessive in "any action for damages, whether in tort or in contract." Fla. Stat. § 768.71(1).

the province of the jury." *Odom v. R.J. Reynolds Tobacco Co.*, 254 So. 3d 268, 277 (Fla. 2018). "[A] court should never declare a verdict excessive merely because it is above the amount which the court itself considers the jury should have allowed." *Id.* (internal quotation marks omitted).

In addition, when a trial court refuses to grant a new trial or reduce a damages award, "the correctness of a jury's verdict is strengthened." *Id.* (internal quotation marks omitted). Absent unusual circumstances, the trial court judge who denied the motion for a new trial had "the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record." *Id.* (emphasis omitted) (internal quotation marks omitted). Given the deference afforded a trial court's decision, an appellate court generally "should not disturb" a verdict as excessive "unless the verdict is inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Id.* (quoting *Lassiter v. Int'l Union of Operating Eng'rs*, 349 So. 2d 622, 627 (Fla. 1976)). Under this standard, our review of the district court's order denying Rockhill's motion for new trial is "very restricted." *Lassiter*, 349 So. 2d at 627.

Rockhill argues that the jury's damages award was excessive because it "bore no relationship to the evidence of damages adduced at trial." Appellant's Br. at 36. According to Rockhill, the evidence allowed the jury only three options with respect to the amount of AM Grand's damages:

(1) to find that all the buildings were damaged in the hurricane, on the interior and the exterior, and needed to be rebuilt, at a cost between $51,000,000 and $66,000,000, and thus AM Grand could recover the policy limits of $15,112,500;

(2) to find that all the buildings' roofs were damaged in the hurricane and needed to be replaced at a cost of approximately $1,200,000, and thus AM Grand could recover $869,750 after subtracting the policy's deductible; or

(3) to find that only a portion of Building D's roof was damaged in the hurricane and needed to be repaired, leaving AM Grand with a loss of $235,556, which was below the policy's deductible, and thus AM Grand could recover nothing.

Because the jury's verdict fell outside these three options, Rockhill says, the verdict was excessive.

Rockhill is correct that the amount of damages depended on the extent to which AM Grand's buildings were damaged in Hurricane Irma. But we disagree that the jury's options were as limited as Rockhill describes. Instead, we conclude—based on the evidence presented at trial—that the verdict was within the range of damages that a jury reasonably could have awarded.

At trial, the parties presented conflicting evidence on the extent of the damage AM Grand sustained due to Hurricane Irma. The jury could have found that the damage fell somewhere between damage to a part of the roof of Building D (as Rockhill

claimed) and damage to the roofs and interiors of every building (as AM Grand claimed). For example, the jury could have found that the hurricane damaged both the roof and interior of Building B, damaged part of the roof of Building D, and caused no damage to the other three buildings. If the jury so found, then based on AM Grand's damages model presented at trial, the jury could have concluded that AM Grand's total loss from the hurricane was $9,200,000. Let us explain how the jury could have gotten there.

For Building B, the jury could have found, based largely on the testimony from AM Grand's witnesses, that the hurricane caused substantial damage to both the roof and interior of the building. The jury heard from Kirschner that he saw damage to the roof of Building B after the hurricane. He observed, among other things, that Styrofoam was missing from portions of Building B's roof. Indeed, witnesses from both sides, Philmon and Arce, confirmed that there was damage to Building B's roof. Philmon testified that he saw "severe deterioration" of Building B's roof, Doc. 270-3 at 180, and Arce testified that the integrity of Building B's roof was "gone." Doc. 270-2 at 26.

It is true that the jury heard conflicting evidence about the cause of the damage to Building B's roof. Philmon opined that the roof's severe deterioration occurred before the storm. But the jury could have disbelieved his testimony and instead credited Brizuela's testimony that Hurricane Irma damaged the roof of Building B.

The jury also heard evidence that the hurricane damaged not only Building B's roof, but also its interior walls. Arce described to the jury how his inspection and testing showed high moisture levels in Building B's walls. And Brizuela opined that this water damage was a result of the storm and the roof's failure, rather than any other cause.

After finding that Hurricane Irma damaged Building B's roof and its interior walls, the jury also could have found based on Brizuela's testimony that it would be more cost effective to tear down and rebuild Building B than to engage in the more labor-intensive and expensive process of trying to repair the water damage inside the walls.[11] It then could have used Gonzalez's damages model indicating that it would cost between $200 and $400 per square foot to rebuild the building. Because the evidence at trial showed that Building B was approximately 39,000 square feet, the jury could

---

[11] Rockhill argues that the jury could not find that any of the buildings needed to be demolished and rebuilt because under Florida law AM Grand could recover the costs of rebuilding only if a "governmental authority issue[d] an order requiring the demolition of the structure or prohibiting repair of the structure." Appellant's Br. at 25. Because there was no evidence of a government order requiring demolition or prohibiting repair of the buildings, Rockhill says, AM Grand could not recover damages for the cost of rebuilding. But Rockhill never took this position in the district court and instead raises it for the first time on appeal. Therefore, we will not consider it. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) ("[A]n issue not raised in the district court and raised for the first time on appeal will not be considered by this [C]ourt.").

have found that it would cost between $7,800,000 and $15,600,000 to rebuild Building B.[12]

For Building D, the jury could have found that the building sustained limited damage to its roof from Hurricane Irma and awarded AM Grand the cost to repair the roof only. There was ample evidence before the jury that Building D's roof sustained damage in the hurricane. Kirschner testified to seeing damage to the roof after the hurricane. Rockhill's witnesses admitted that Building D's roof sustained some damage from the hurricane and needed at least some repairs: Chavers testified that he saw "physical damage" to the roof of Building D and Philmon agreed that he saw that "the roof over Building D was damaged by wind." Doc. 270-3 at 129, 162.

The evidence also supported a finding that the limited damage to Building D's roof could be repaired without replacing the entire roof. The jury could have reached this conclusion based on Philmon's testimony that the damage to Building D was limited "to the roof covering, downspouts[,] and gutters" and there was "no

[12] Rockhill has not challenged on appeal the admission of Brizuela's expert testimony that rebuilding would be less expensive than repairing or Gonzalez's expert testimony about the cost per square foot to rebuild.

We note, too, that at trial Rockhill made a strategic decision to focus on challenging AM Grand's evidence about the extent of the damage caused by the hurricane. It could have, but did not, introduce its own evidence about what it would cost to repair water damage in the interior of any of the buildings, the cost per square foot to rebuild buildings in an assisted living facility, or whether rebuilding would be less expensive than making repairs.

interior or structural damage" to the building. *Id.* at 162, 170. And based on Rockhill's estimate, the jury could have found that it would cost $235,556 to repair this damage.

Finally, as to the three remaining buildings, the jury could have found that AM Grand failed to prove that they sustained any damage from Hurricane Irma. Although Arce and Brizuela opined that these buildings' roofs and interiors were damaged in the storm, there was evidence going the other way. The jury heard Chavers's and Philmon's opinions that these buildings sustained no damage from Hurricane Irma and that the water damage inside them occurred before the storm. Even Kirschner, AM Grand's corporate representative, did not report seeing any damage to the roofs of these buildings after the storm. As a result, the jury reasonably could have awarded AM Grand no damages for the three remaining buildings.

If the jury made the findings described above about the extent of the damage to each building, then based on the evidence about the cost of rebuilding Building B and repairing Building D's roof, the jury could have calculated AM Grand's loss from the hurricane to be between $8,035,556 and $15,835,556. The jury's finding that AM Grand's loss was $9,280,000 was well within this range. *See United States v. Sullivan*, 1 F.3d 1191, 1196 (11th Cir. 1993) (explaining that a "jury enjoys substantial discretion in awarding damages within the range shown by the evidence" and is entitled to "reject the figures offered by the parties").

In arguing that the jury's verdict was excessive, Rockhill says that because AM Grand tried the case as a total-loss case, maintaining that *all* the buildings sustained both roof and interior damage from the hurricane, the jury had no basis for finding that some, but not all, of the buildings needed to be rebuilt.[13] Not so. Given the conflicting evidence at trial about the extent of the damage to each building individually and whether Hurricane Irma was the cause of the damage, the jury, as factfinder, was free to find that some, but not all, of the buildings sustained damage from the hurricane and to determine the extent of the damage to each building.

We acknowledge that in arriving at a loss amount of $9,280,000, the jury likely had to have credited some parts of a witness's testimony while rejecting other parts of that same witness's testimony. For example, the jury may have credited Brizuela's opinion that it would be more cost effective to rebuild than replace buildings with interior water damage but not credited his opinion that all the buildings sustained damage in the hurricane. But it was well within the jury's role of fact finder to make such credibility

---

[13] Rockhill raised for the first time at oral argument another reason why the jury could not find that some, but not all, the buildings needed to be rebuilt. It argued that because of the way the buildings were connected, if any building needed to be demolished, all would need to be demolished. Rockhill thus contended that it was impossible for the jury to conclude that only some of the buildings needed to be rebuilt. Assuming it is not too late for Rockhill to raise this argument, it has identified no evidence in the record to support its assertion that it would be impossible to demolish and rebuild some, but not all, of the buildings. And after carefully reviewing the record, we have found no such evidence.

determinations. *See Moore v. Chesapeake & O. Ry. Co.*, 340 U.S. 573, 576 (1951) (recognizing that a jury may "credit or discredit all or part of" a witness's testimony*); Seymour v. Oceanic Navigating Co.*, 453 F.2d 1185, 1190 (5th Cir. 1972) (recognizing that a factfinder "may, of course, choose to reject certain portions of a witness's testimony while accepting other portions").[14]

What is more, there are other ways that the jury reasonably could have arrived at its $9,280,000 damages verdict. As AM Grand's counsel explained at oral argument, the jury could have found that Building A1, which covered approximately 27,000 square feet, suffered both roof and interior damage from the hurricane and that AM Grand would need to rebuild this building. Using Gonzalez's damages model, the jury could have found that it would cost between $5,400,000 and $10,800,000 to rebuild. Or the jury could have found that Buildings A1 and A2, which together totaled approximately 44,000 square feet, both needed to be rebuilt due to roof and interior damage from the storm. Applying Gonzalez's damages model to this scenario, the jury could have found that it would cost between $8,800,000 and $17,600,000 to rebuild Buildings A1 and A2. Under either of these additional scenarios, the

---

[14] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

22                          Opinion of the Court                          20-13954

trial evidence would have supported the jury's $9,280,000 verdict.[15]

The jury's damages award in this case was not "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Odom*, 254 So. 3d at 277 (internal quotation marks omitted). We reach this conclusion after considering the evidence in the record as well as the "deference properly given to the jury's determination of such matters of fact as the weight of the evidence and the quantum of damages" and the deference due the district court, which denied Rockhill's motion for a new trial after "observ[ing] the witnesses" and "consider[ing] the evidence in the context of a living trial rather than upon a cold record." *Id.* (emphasis omitted) (internal quotation marks omitted).[16]

---

[15] Rockhill speculates that the jury reached its $9,280,000 verdict based on evidence showing that AM Grand's parent company lost approximately $9,000,000 in its investment when it sold the property. Rockhill argues that it would have been improper for the jury to consider the ultimate value of AM Grand's investment to calculate its loss from the hurricane under the insurance policy. Because, as we explain above, the jury's award was reasonable and supported by evidence about the loss that AM Grand sustained in the hurricane, we need not address Rockhill's argument.

[16] Rockhill also argues that the district court erred in denying its motion for relief from judgment under Federal of Civil Procedure 60. It says that because the jury's "verdict was excessive," the district court erred in denying its Rule 60 motion and refusing to set aside or reduce the verdict. Appellant's Br. at 35. We affirm the district court's denial of the Rule 60 motion for the same reasons that we affirm the denial of the Rule 59 motion for a new trial.

20-13954                Opinion of the Court                23

**AFFIRMED.**